300 So.2d 154 (1973)
STATE of Louisiana et al.
v.
PLACID OIL COMPANY et al., Intervention of Texaco, Inc.
Nos. 53294, 53295.
Supreme Court of Louisiana.
December 3, 1973.
On Rehearing June 10, 1974.
Rehearings Denied August 30, 1974.
Dissenting Opinion September 20, 1974.
*155 W. Scott Wilkinson, Wilkinson, Carmody & Peatross, Shreveport, Armand A. Gutierrez for Placid Oil Co. and others.
Wiley G. Lastrapes, William J. Conrad, New Orleans, Charles F. Bailey, Bailey & Hollier, Lafayette, for Texaco, Inc., intervenor-respondent.
William J. Guste, Jr., Atty. Gen., Kenneth DeJean, Asst. Atty. Gen., Ernest R. Eldred, Sp. Asst. Atty. Gen., Nora K. Duncan, Sp. Counsel, Baton Rouge, for State of La.; A. N. Yiannopoulos, Baton Rouge, of counsel.
Kennedy J. Gilly, John C. Christian, John T. Nasser, III, Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, for J. Ray McDermott & Co., Inc.
Booth Kellough, Liskow & Lewis, Charles C. Gremillion, New Orleans, for Gulf Oil Corp.
Frank C. Allen Jr., James H. Roussel, New Orleans, for defendants-respondents.
MARCUS, Justice.
This is an action by the State of Louisiana and its mineral lessee, Gulf Oil Corporation, involving an area of land located below the ordinary high water mark of a body of water in St. Mary Parish known as "Six Mile Lake" adjacent to Sections 49, 50 and 68, Township 15 South, Range 11 East. State seeks to be declared owner of this land; additionally, plaintiffs seek an accounting of the proceeds of three oil wells drilled thereon by Placid Oil Company and designated as S. G. Todd Wells 3, 4 and 5. Made original defendants were Placid Oil Company and its assignee, J. Ray McDermott & Company, Inc. Pursuant to exceptions of non-joinder of indispensable parties filed by Placid and McDermott, numerous alleged owners (from whom Placid acquired mineral leases) were also made party defendants. Texaco, Inc., which owns an undivided one-half of Section 68, and certain parties claiming interests in Section 68 adversely to Texaco, intervened asserting interests in opposition to State-Gulf. The conflicts between Texaco and its adversaries concerning Section 68 have been compromised. Some dispute exists among defendants regarding their ownership of subject sections; however, it was stipulated that this matter would be deferred for determination at a future date between the parties in interest. Thus, all parties, including Texaco as intervenor, are aligned as defendants in opposition to plaintiffs' claims.
Exceptions of no cause and no right of action, res judicata, judicial estoppel and stare decisis were overruled by the trial court, which rulings were affirmed by the Court of Appeal. Since we will dispose of this case on the merits and will render judgment in favor of exceptors-defendants, *156 the merits of the exceptions filed by them are of no moment.
The trial court rendered judgment in favor of defendants and against State-Gulf, rejecting their demands and decreeing the land area bounded on the south by the traverse line abutting Sections 49, 50 and 68, Township 15 South, Range 11 East, St. Mary Parish, and north to the ordinary low water mark of Six Mile Lake to be the property of the riparian landowners of these three sections. It further decreed the ordinary low water mark of Six Mile Lake as of July 8, 1963, the date of the filing of this suit, to be a line having an elevation of +.11 feet above mean sea level subject to changes, if any, in said line, as may subsequently result from accretion, reliction or dereliction. It further ordered that State Lease No. 2963 dated April 18, 1956 to Gulf Refining Company and State Lease No. 3643 to Placid Oil Company be cancelled and annulled insofar as said leases purport to cover and affect any of the property as described in the judgment and the subject of this suit. The trial court further rendered judgment against State-Gulf, in solido, taxing as court costs for expert witness fees for Placid the sum of $31,733.29 and in favor of Texaco the sum of $31,345.94. No mention was made by the trial judge of Act 341 of 1952, R.S. 9:1151. The judgment of the trial court contained other decrees not pertinent to this appeal.
The Court of Appeal affirmed the trial court in holding that Six Mile Lake constitutes a stream as opposed to a lake, thereby making applicable the rules of property provided in Articles 455 and 509 of the Civil Code. Having arrived at that conclusion, the Court of Appeal then held: (a) that the portion of the area in dispute identified and referred to as the "Woodland Tract" comprised a part of the bank of Six Mile Lake; that, under the provisions of Article 455, C.C., the banks of streams belong to the riparian owners; and that such construction of said Article 455 coincides with the rule of property contained in Article 509, which gives alluvion to the owner of land adjacent not only to a river but also to a stream; (b) that the portion of the area in dispute referred to as "Barnett's Cove" properly constitutes alluvion or accretionary build-up of a land mass which is attached to and belongs to the riparian landowners; (c) that the portion of the area in dispute identified as the "Island Area" is land formed not as an island which subsequently attached to the shore, but as alluvion which belongs to the riparian owners; (d) that method of ascertaining the ordinary low water mark in the area in controversy adopted by the trial court was well founded; (e) that the award for court cost and expert witness fees incurred by Placid ($31,733.29) and by Texaco ($31,345.94) was correct, such costs being assessed, in solido, against State-Gulf with Gulf to pay any portion thereof that the State was exempt from paying by law. (R.S. 13:4521) The Court of Appeal further held that the trial court erred in failing to give effect herein to Act 341 of 1952 (R.S. 9:1151) with respect to the lease by the State to Gulf dated April 18, 1956, and rejected Placid's claim of the unconstitutionality of this Act. The Court of Appeal reversed that part of the judgment which orders State Lease No. 2963 dated April 18, 1956 to Gulf cancelled and remanded the suit to the trial court for the limited purpose of establishing the ordinary low water line in the area in controversy as of April 18, 1956 in order to determine the effect of State Lease No. 2963 to Gulf on land areas located on the water side of the ordinary low water line as determined to have existed on said date. The remand also included an accounting for the value of oil and gas which may have been produced from or attributable to the land areas in question as well as ascertaining the rights, if any, for reimbursement for allocable drilling and operational costs of any of the three wells in question. Similarly, that part of the judgment of the trial court which recognized Placid, McDermott and Texaco as the owners of mineral leases affecting all the property described *157 in such judgment was likewise reversed and remanded for the purpose of determining what part, if any, of the land in question is validly covered by State Lease No. 2963 as established by the ordinary low water mark as same is determined to have existed on April 18, 1956. In all other respects, the judgment appealed from was affirmed. 274 So.2d 402.
State and Gulf each separately applied to this Court for a writ of certiorari or review which was granted. 275 So.2d 778 (La.1973).
Relators, State of Louisiana and Gulf Oil Corporation, assigned as errors in the opinion and decree of the Court of Appeal the following:
1. The holding that Grand Lake-Six Mile Lake is a stream within the meaning of that term as used in Louisiana Civil Code Article 509.
2. The holding that the title to banks of streams belongs to the riparian owner under the provisions of Article 455 and that Article 509 grants title to alluvion to the riparian owner.
3. The holding that the areas herein identified as Barnett's Cove and the Island Area, which areas were formerly a part of the bed of Grand Lake, were formed by accretions classified as alluvion and subject to the application of Article 509.
4. The holding adopting a method for determining the ordinary low water mark in the area involved, which method is indefinite in that it, even by admission of its proposer, is not based on an objective criterion but could have as many different results as persons applying it.
5. The holding that the District Court did not abuse its discretion in taxing as costs expert witness fees in the amount of $63,079.23 which included allowances for travel, room and board in excess of those permitted by R.S. 13:3661, as well as payment for services for assistance by experts to counsel in preparation and trial of the case as distinguished from the expert's preparation to and testifying as an expert witness.
6. The additional holdings of the Court of Appeal, such as the cancelling of the lease granted by the State of Louisiana to Gulf on April 18, 1956, insofar as it covers any portion of the area in dispute, which result from the previously assigned errors.
State-Gulf assert in the first assignment of error that the Court of Appeal erred in holding that Grand Lake-Six Mile Lake is an "other stream" within the meaning of Article 509 of the Civil Code.
It is well settled that the beds or bottoms of all navigable waters in the State, whether lakes, rivers or streams, belong to the State by virtue of its inherent sovereignty. State v. Capdeville, 146 La. 94, 83 So. 421 (1919).
We are satisfied from our examination of the record that Grand Lake-Six Mile Lake was a navigable body of water at the time Louisiana was admitted into the Union in 1812. Therefore, if Grand Lake-Six Mile Lake is classified as a lake, the State would own the bed or bottom up to the ordinary high water mark by virtue of its sovereign rights. State v. Bozeman, 156 La. 635, 101 So. 4 (1924).
With respect to the beds or bottoms of navigable rivers and streams, the State holds in her sovereign capacity only the land that is covered by water at its ordinary low stage. Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922). Furthermore, the land lying between the ordinary low water mark and the ordinary high water mark is called the bank of the stream and belongs to the owner of the adjacent land, subject to the use by the public. Articles 455 and 457 of the Civil Code. Wemple v. Eastham, supra.
The laws of this State governing accretions and derelections are set forth in Articles *158 509 and 510 of the Civil Code, which provide as follows:
"Art. 509. The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.
"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."
"Art. 510. The same rule applies to derelictions formed by running water retiring imperceptibly from one of its shores and encroaching on the other; the owner of the land, adjoining the shore which is left dry, has a right to the dereliction, nor can the owner of the opposite shore, claim the land which he has lost.
"This right does not take place in case of derelictions of the sea."
It is well settled that, under Article 509, accretions formed successively and imperceptibly on the shores of rivers or other streams, whether navigable or not, belong to the owners of the property to which they attach, but this is not the law in the case of lakes, bays and arms of the sea. Zeller v. Southern Yacht Club, 34 La.Ann. 837 (1882); Miami Corporation v. State, 186 La. 784, 173 So. 315 (1936); Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943); Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957).
Accordingly, we must determine whether Grand Lake-Six Mile Lake was a river or stream, or a lake at the time of the State's admission to the Union in 1812. In the event it was a river or stream, Article 509 would be applicable; whereas, if it were a lake, Article 509 would not apply.
In order to make this determination, we must first refer to the law and jurisprudence of this State. As previously indicated, the statutory law dealing with accretion and dereliction is set forth in Articles 509 and 510 of the Civil Code. Hence, we must examine the cases which have interpreted these codal articles in an attempt to determine the type of body of water which would constitute a river or other stream under Article 509.
Many cases have been cited to us for our consideration, but, after reviewing them, we find only the following decisions involved the issue of the classification of a water body for application of our laws of accretion and dereliction. These are: State v. Erwin, 173 La. 507, 138 So. 84 (1931); Miami Corporation v. State, 186 La. 784, 173 So. 315 (1936); Ameranda Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943); Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431 (1946); Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957); and State v. Cockrell, 162 So. 2d 361 (La.App. 1st Cir., 1964), writ refused 246 La. 343, 164 So.2d 350 (1964).
State-Gulf contend that the rule in Erwin properly sets forth the law of the State insofar as expansive water bodies are concerned regardless of their other characteristics as running bodies of water with substantial capacity to create accretions and derelictions. Further, they contend that the Amerada cases and the Esso case are distinguishable as they involve lesser water bodies and that Cockrell is in direct conflict with Erwin and should be overruled.
Erwin involved Calcasieu Lake, a large body of water in Cameron Parish, which is approximately 18 miles long and varies in width from 4½ miles to about 12 or 14 miles. The Calcasieu River entered in from the north and came out of its southern end on its way to the Gulf of Mexico. The opinion states that there is a channel through the lake through which there is a perceptible current when the river is high due to heavy rains; however, in ordinary stages of the water in the river there is, if *159 any, only an almost imperceptible current in the channel. The issue presented in this case was the ownership of that part of the lake formed by the erosion of the soil since admission of Louisiana to statehood. The Court concluded that resolution of this issue depended upon the applicability of Articles 509 and 510. Conceding that these articles do not apply to lakes, the Court proceeded to determine whether Calcasieu Lake was a lake or a river within the contemplation of the laws governing accretion and dereliction. The Court considered the historical background of Civil Code Articles 509 and 510 (including the articles of the French Code from which they are derived) and acknowledged that in France, Calcasieu Lake would probably be considered a section of the Calcasieu River and subject to the laws of alluvion and dereliction. However, without assigning reasons for doing so, the Court dismissed that consideration and disposed of the issue in the following words: "* * * In our opinion, however, the better viewwith reference to the laws, governing alluvion and derelictionis to regard such a vast expanse of water as Calcasieu Lake as being in fact a lake, although a river empties into the sea through it." The Court concluded that Calcasieu Lake was a true lake and that Articles 509 and 510 covering alluvion and dereliction had no application to the case but decided, nevertheless, that the submerged lands belonged to the riparian owners. On rehearing, the Court held that the lake was not an arm of the sea and reiterated its previous views.
We find that Erwin adopts an unworkable and arbitrary standard for classifying water bodies with no real relationship with the meaning and purpose of Articles 509 and 510. The use of such a standard would make it next to impossible to determine when a water body was wide enough to be classified as a lake and narrow enough to be considered a river or stream.
Miami Corporation v. State followed Erwin in 1936. The issue involved was the ownership of land which had become part of the bed of a navigable water body along the shore of Grand Lake in Cameron Parish. The factual situation in Miami was almost the same as in Erwin except that the water body involved was Grand Lake, through which the Mermentau River flows on its way to the sea. Miami reversed Erwin by deciding that the bed or bottom of Grand Lake, a navigable body of water, including the submerged lands in controversy, belonged to the State of Louisiana, by virtue of its sovereignty, it being a public thing and insusceptible of private ownership under Articles 450 and 453 of the Civil Code. The Court then stated that: "* * * Having reached the above conclusion, it is unnecessary to consider the applicability of articles 509 and 510 of the Revised Civil Code to this case." Thus, the lake-stream issue was not presented in that case for the obvious reason that the rule announced by the Court applied to any navigable water whether it was a lake, stream or otherwise.
Defendants urge that the rule of State v. Erwin, with respect to the definition of a lake as distinguished from a river or stream, appears to have been clearly overruled by subsequent decisions, primarily Amerada Petroleum Corporation v. State Mineral Board, hereinafter referred to as "First Amerada," Amerada Petroleum Corporation v. Case, hereinafter referred to as "Second Amerada," Esso Standard Oil Company v. Jones, and State v. Cockrell. We agree.
First Amerada was decided by this Court in 1943. It dealt with the ownership of accretions which had attached to the shore of the Arm of Grand Lake in St. Martin Parish which lies north of and empties into Grand Lake with which we are presently concerned. The lake-stream issue was squarely presented to the Court in that case, and we feel that its pronouncement thereon, which has been subsequently followed in other decisions of this Court, is determinative of the legal principle on this point in the instant case. The Court held the body of water involved therein to be a *160 stream to which the provisions of Article 509 applied, and on that finding, awarded the disputed land to the riparian owner. The Court quoted extensively from the well-reasoned opinion of the trial court. In deciding that the Arm of Grand Lake was a stream within the meaning of Article 509 as distinguished from a lake to which this article would not apply, the Court clearly defined a lake as a body of water which is more or less stagnant and is supplied by drainage. On the other hand, a river was distinguished from a lake in that it flows, more or less, in a permanent bed or channel between well-defined banks, with a current, whereas streams are bodies of flowing waters including rivers. The Court concluded that, since the Arm of Grand Lake was a flowing body of water, it constituted a stream within the meaning of Article 509. The Court was convinced that the provisions of Article 509 were intended to apply to such bodies of flowing water which had the capacity to form accretions.
We note the following appropriate language from First Amerada:
"It will be noted, from an examination of the quoted portion of his opinion, the trial judge holds that the body of water known as the arm of Grand Lake can not be classified as a river, because it does not possess well defined banks or walls as are required of rivers, and, on the other hand, that it can not be classified as a lake, because its waters are not still or dead and they are not supplied from drainage as is required of lakes. However, his holding is that the arm of Grand Lake is a body of flowing water, and therefore it constitutes a stream within the meaning of the term, `or other stream' referred to in Article 509 of the Civil Code. He reasons very logically that the `other stream' referred to in the article includes streams falling into the category of rivers. This inclusion covers the case here, because the stream involved possesses all the characteristics of a river in its ability to remove and deposit the soil.
"* * *
"The trial judge held that the arm of Grand Lake is a stream of flowing water and that Article 509 of the Civil Code applies to the alluvion on its banks. Regardless of the characterization of the water as a river or merely as a flowing stream, the conclusion reached by the trial judge is correct."
It can readily be seen that the Court clearly distinguished a lake from a river "or other stream" and defined the meaning of the term "or other stream" referred to in Article 509 as a body of flowing water with the ability to remove and deposit soil. Furthermore, it is apparent that the Erwin principle had been abandoned.
The Second Amerada case (1946) involved part of the identical alluvion formation involved in First Amerada, but it was contended that Article 509 did not apply because the build-up was not on the shore of the Arm of Grand Lake, but rather on the shore of Grand Lake itself. The Court concluded that, since the alluvion area in dispute was a continuation of the alluvion area in First Amerada, title thereto would be governed by the Court's decision in the former case. This case affirmed the Court's previous ruling in First Amerada and lends additional support to that decision.
The rule of First Amerada was again approved by the Supreme Court in Esso Standard Oil Company v. Jones, in 1957. The case involved a change of the Mississippi River channel from Deer Park Bend to Glasscock Cut-Off by artificial means. In determining the applicability of the rule of alluvion in Article 509, the Court again followed the rule set forth in First Amerada and held that, since the waters of Deer Park Bend contained a natural current capable of carrying alluvion and depositing it along its banks, it was a stream as distinguished from a lake. The Court approved *161 and adopted the reasons of the trial judge as the opinion of that Court, from which we quote the following pertinent part:
"`In the present case at the present time there is not a constant or continuous flow at low water around the bendway every day in every year, but definitely the bendway is not a lake. When it does flow it is not drainage and the bendway gets its water from the main body of the Mississippi River. A stream is not required to flow every minute of the time. In this case the bendway is characterized by definite banks on each side, a definite bed, a natural current always downstream with the main body of the Mississippi River being the source of water supply. The current is capable of carrying alluvion and of depositing it along the banks. These characteristics fulfill every possible requirement of a stream and prevent the Deer Park Bend channel from being classified as a lake or pond up to this time. That location may change some time in the future becoming a dead lake, but it had not done so at this writing. * * *"
It was within this background that the Cockrell case was presented in 1964. The identical lake-stream issue was before the court. This time it involved alluvion which had formed on the shore of Six Mile Lake in St. Mary Parish. In view of the ruling of First Amerada in 1943, which was approved three years later in Second Amerada, and again fourteen years later in Esso, the result of Cockrell could be readily predicted. The First Circuit Court of Appeal[1] held:
"We conclude, therefore, Six Mile Lake is a stream as distinguished from a lake considering it is shown to be a body of water containing currents of sufficient velocity to carry alluvial materials. Moreover, the record conclusively shows the flow of water entering Six Mile Lake and causing its currents is not the result of drainage but the natural movement or flow of the waters of the Atchafalaya River passing through the waterway known as the Atchafalaya Basin on its way to the sea. Because the banks of Six Mile Lake are not well defined as in the case of rivers, the body of water in question must be characterized as a stream rather than a river. Technically speaking, Six Mile Lake appears to be a segment of the Atchafalaya River. The record in the case before us leaves not the slightest doubt but that Six Mile Lake does in fact annually carry off a substantial portion of the tremendous volume of water flowing to the sea through the Atchafalaya River. It further appears beyond question, this condition antedated 1812 and has continued to the present time.
"It follows, therefore, Six Mile Lake was a stream in 1812 within the meaning and intendment of the term `other stream' as used in Article 509, LSA-C. C., consequently the provisions of said article are applicable to the case at bar as held by the learned trial court. * * *"
We are here again presented with a review of the lake-stream issue dealing with the same body of water which was involved in the Cockrell case. We have carefully re-examined the jurisprudence with respect to this issue and reach the same inescapable conclusion. Nothing new or different has been presented in this case which has not been argued before and reviewed in our previous decisions. Accordingly, we conclude that the rule of the Erwin case, insofar as it holds that a body of water is a lake, even though water runs and flows through it with sufficient capacity and velocity to carry alluvion, to which the laws governing alluvion and dereliction (Articles 509 and 510) have no application, has been clearly overruled by subsequent *162 decisions of this Court. We further hold that the rule first enunciated in First Amerada and approved and affirmed in Second Amerada, Esso and Cockrell is now affirmed by us in this case: that a body of water through which a current flows or runs with such capacity and velocity and power as to form accretions is characterized as a river or stream, depending upon all attending circumstances, for the purpose of applying the rules of accretion and dereliction set forth in Articles 509 and 510 of the Civil Code.
Having determined the legal definition of a river or stream for the purpose of applying the provisions of Articles 509 and 510, we must next decide whether Grand Lake-Six Mile Lake factually falls within this definition.
We reiterate at the outset that the identical issue was presented in Cockrell, as Six Mile Lake was there involved as it is herein. The present action constitutes practically a re-trial of that case. The plaintiffs in this case are the identical plaintiffs in the Cockrell case. The areas in controversy in the two cases are practically the same, as the well in the Cockrell case was located approximately 4500 feet east of S. G. Todd Well No. 3, which is in close proximity to S. G. Todd Wells Nos. 4 and 5 (three wells involved in this case). Generally, the same experts who testified in the Cockrell case testified in the present case: notably, Dr. Reinhard A. Steinmayer; Dr. John P. McDowell; Dr. Willis A. Eggler; and Mr. Philip Whitaker.
Based upon a study of ancient documents, maps and journals, we are convinced that the Atchafalaya River in 1812 and prior thereto carried waters through Grand Lake-Six Mile Lake to the Gulf of Mexico. This has been previously recognized by the courts of this State. State v. Capdeville, 146 La. 94, 83 So. 421 (1919); Amerada Petroleum Corporation v. State Mineral Board, supra; State v. Cockrell, supra. We further find that Six Mile Lake was a stream in 1812 when the State of Louisiana was admitted into the Union and has remained as such until the present time. A careful review of the voluminous record makes it amply clear that Six Mile Lake has all the physical characteristics of a running stream with the power, force and velocity to carry sediment and to form alluvion and is, therefore, a true stream within the meaning of Articles 509 and 510 as defined by the jurisprudence of this State. In arriving at these conclusions, we were much impressed and relied heavily on the testimony of Professor R. A. Steinmayer, Dr. J. J. McDowell and Dr. W. A. Eggler. We have refrained from detailing the evidence upon which the foregoing conclusions are based as it has been ably set forth in an exhaustive review of the testimony and evidence by the trial judge in his fifty-five page well-reasoned opinion, as well as in the learned opinion of our brethren of the First Circuit Court of Appeal. Hence, a repetition thereof would serve no useful purpose.
It is contended in the second assignment of error that the Court of Appeal erred in holding that the banks of a stream belong to the riparian owner under the provisions of Article 455 and that Article 509 gives alluvion to the owner of the land adjacent to a river or stream. The pertinent articles of the Civil Code on the subject are Articles 455 and 509.
Article 455 provides as follows:
"The use of the banks of navigable rivers or streams is public; accordingly, everyone has a right freely to bring his vessels to land there, to make fast the same to the trees which are there planted, to unload his vessels, to deposit his goods, to dry his nets, and the like.
"Nevertheless, the ownership of the river banks belongs to those who possess the adjacent lands."
State-Gulf contend that Article 455 recognizes that river banks only are owned by the riparian owners, thereby impliedly reserving to the State the banks of other water *163 bodies not expressly mentioned, including streams. Such argument has no valid basis either considering Article 455 alone or when read in pari materia with Article 509.
The first paragraph of Article 455 provides that the use of the banks of navigable rivers or streams is public. This provision is consistent only with the private ownership of the banks of both rivers and streams. If the State already owns the banks of navigable streams within its borders, there would be no necessity for such a provision with respect to streams as obviously the banks would be already subject to public use. Therefore, the second paragraph which provides that, nevertheless, the ownership of the river banks belongs to those who possess the adjacent lands, obviously refers to both navigable rivers and streams. Such construction of Article 455 coincides with the rule of property contained in Article 509 which gives alluvion to the owner of land adjacent not only to a river but also to a "stream." This issue was raised in connection with the area referred to as the Woodland Tract. We agree with the finding of the Court of Appeal that this area is composed of bank as opposed to alluvion, and inasmuch as Six Mile Lake has properly been classified as a stream, the bank thereof belongs to the riparian owner under Article 455.
In the third assignment of error, State-Gulf urge that even if Six Mile Lake is classified as a stream rather than a lake, the areas identified as Barnett's Cove and the Island Area were not formed by accretions and should not be considered alluvion, as that term has been defined in Article 509. State-Gulf's primary contention in reference to Barnett's Cove is that this area did not fill in successively and imperceptibly by natural processes, but rather was created artificially as the result of dredging operation conducted in Wax Lake Outlet. In affirming the findings of the court below on this point, we quote with approval the conclusion of the Court of Appeal:
"Our review of the record satisfies us that the trial judge committed no manifest error in concluding that the preponderance of the evidence supports defendants' contention that the area comprising `Barnett's Cove' properly constitutes alluvion or accretionary build-up of a land mass which is attached to and belongs to the riparian landowners. In making this determination, the trial judge relied heavily on the expert testimony of defendants' witness, Dr. McDowell. Dr. McDowell testified that while some of the alluvion was undoubtedly comprised of dredge spoil material, nevertheless, this material was deposited as a result of the natural effects of running water rather than as a result of having been pumped into or placed directly in the `Barnett's Cove' area. While this testimony is contradicted in certain respects by expert and lay testimony offered by State-Gulf, we find no manifest error committed by the trial judge in resolving this issue adversely to State-Gulf."
It is well established in our jurisprudence that as long as the formation of the alluvion or batture is successive and imperceptible, it is immaterial that acts of man contributed to the formation of the alluvion. St. Clair County v. Lovingston, 23 Wall 46, 90 U.S. 46, 23 L.Ed. 59; Amerada Petroleum Corporation v. State Mineral Board, supra; Esso Standard Oil Company v. Jones, supra; State v. Cockrell, supra. Accordingly, we conclude that, even though the dredging of Wax Lake Outlet may have contributed to the formation of the accretion in Barnett's Cove, the build-up was nevertheless successive and imperceptible and, under Article 509 and the cases interpreting that article, the accretion belongs to the riparian owners.
The remaining area of contention is that area referred to as the Island Area. It is the same area on which the Cockrell well was located. No well constituting a basis for this action is located on the Island Area, but ownership of this area has been again placed at issue in the instant case.
*164 We are concerned with the ownership of the accretionary area under the application of either Article 509 or 512, which latter article provides as follows:
"Islands and sand bars, which are formed in the beds of navigable rivers or streams, and which are not attached to the bank, belong to the State, if there be no adverse title or prescription."
State-Gulf concede that, if this area of accretion first manifested itself above low water and formed successively and imperceptibly to the shore of a river or stream in accordance with Article 509, it would be alluvion and would belong to the riparian owner; but if the accretion first manifested itself above low water as an island or sand bar formed in the bed of a navigable river or stream and not attached to the bank, it belongs to the State under Article 512. There is no dispute over the fact that this accretionary area built "successively and imperceptibly;" the sole issue is whether it commenced at the shore and built outward to its present northern extremity or whether it originally emerged as an island or sand bar. While defendants urge that the record clearly establishes that this land mass built from the shore outward, alternatively, they argue that, even if the accretionary area was originally formed as an island or sand bar and subsequently attached to the shore, a literal reading of Article 512 would result in the divestiture of the State's title to the island by its subsequent attachment to the shore.
A substantial part of the testimony in evidence introduced in this case was in connection with this Island Area issue. It is interesting to note that the same "island" theory with respect to the same build-up was presented and rejected in the Cockrell case on the basis of the testimony of expert witnesses, Dr. J. P. McDowell and Dr. Willis Eggler who also testified on behalf of the defendants in this case. After evaluating and analyzing the conflicting expert testimony and other evidence in the record, we conclude that the courts below correctly resolved this issue by finding that the accretionary area referred to as the Island Area was built up successively and imperceptibly from the shore outward to its present northern extremity in Six Mile Lake. Accordingly, this area is owned by the riparian owners under the provisions of Article 509. In arriving at this conclusion, we were more impressed with the expert testimony of the witnesses presented by the defendants than those offered by State-Gulf. Having thus concluded, it is unnecessary for us to consider defendants' alternative argument.
The fourth assignment of error is leveled at the method employed by the courts below in determining the ordinary low water line. The trial judge adopted and the Court of Appeal affirmed the method of calculation employed by defendants' engineer, Philip Whitaker. Mr. Whitaker's method is set forth in the opinion of the trial judge as follows:
"He first obtained a complete set of gauge records of the U. S. Corps of Engineers of the Verdunville Gauge as recorded during the period of 1933 to 1962 and from these records the daily highs and lows were tabulated, and from that tabulation a graph was drawn * * * to show visually the water surface from year to year and to determine a low water season and a high water season during each particular year. He then averaged out the daily lows during the low water seasons over the entire thirty year period. * * * The result showed an ordinary low water line of +0.26 mean sea level, less the stipulated dinary low water mark at Wax Lake stream gradient of 0.15, indicating an or-Outlet of +.11 feet above mean sea level. The low water mark as determined by this method is plotted on Exhibit I-19."
State-Gulf contend that this method is objectionable because it is calculated on what Mr. Whitaker calls the "low water season" and averages the daily lows during that season. The complaint is that there is no formula or objective method in determining *165 the "low water season," but rather it represents a completely subjective method in the selection of the low water season each year.
We disagree with this contention. A reading of the record clearly demonstrates that the method employed by Mr. Whitaker was the fairest and most reasonable method proposed. Accordingly, we conclude that the method of determining the ordinary low water line accepted by the courts below is well-founded and is approved by us upon review.
The fifth assignment of error is predicated on the complaint that the Court of Appeal erred in affirming the excessive expert witness fees allowed by the trial court. Placid was awarded $31,733.29 and Texaco, the sum of $31,345.94.
The statutory authority for fixing compensation of expert witnesses is R.S. 13:3666, which provides in pertinent part:
"A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required."
While we recognize that experts are entitled to not only a fee for their appearance in court, but also an award for their preparatory work, these fees must be reasonable and somewhat in line with the fees heretofore allowed by the courts of this State. Recreation and Park Commission v. Perkins, 231 La. 869, 93 So.2d 198 (1957).
We likewise realize that valuable acreage and oil and gas production are involved in this litigation. Furthermore, the issues are technical and complicated and required special skill and training on the part of those who gave expert testimony.
With the foregoing in mind, we have reviewed the testimony of the expert witnesses during the trial on the merits, as well as during the hearing to tax costs, and have studied the invoices and statements which were filed into evidence. We conclude therefrom that the awards allowed by the courts below are excessive. This conclusion is based primarily on our finding that there was an excessive amount of costs and time expended in preparation of trial which includes field trips, engineering and survey work, conferences, reports and time waiting to testify. This preparatory work strikes us as being out of proportion to the time and scope of the testimony presented at the trial. Accordingly, we reduce the expert witness fees to the following: Dr. John P. McDowell, $2,800.00; Dr. Willis A. Eggler, $2,300.00; Dr. R. Kazmann, $350.00; Prof. R. A. Steinmayer, $3,700.00; William Clifford Smith of the firm of T. Baker Smith & Son, Inc., Civil Engineers and Surveyors, $9,000.00; Philip Whitaker of the firm of F. Shutts' Sons, Civil Engineers, $12,500.00; Louis C. Peters of the firm of Barnett & Peters, Consulting Foresters, $2,700.00.
The effect of these reductions will reduce the total awards of expert witness fees to Placid from $31,733.29 to $18,150.00, and to Texaco from $31,345.94 to $15,200.00. Furthermore, we find that the assessment of court costs against State-Gulf, in solido, with Gulf to pay any portion thereof that the State is exempt from paying by law (R.S. 13:4521) is correct.
In the sixth assignment of error, State-Gulf pray that this Court modify the judgment of the Court of Appeal in accordance with their assigned errors. As set forth above, we have reviewed each of the assigned errors, but have found merit only in the fifth assignment of error. Therefore, the judgment of the Court of Appeal will be amended only to that extent.
The Court of Appeal found merit in the contention of State-Gulf that the trial judge erred in failing to give effect herein to Act 341 of 1952 (R.S. 9:1151) with respect to the lease by the State to Gulf dated April 18, 1956.
*166 Act 341 of 1952 (R.S. 9:1151) provides as follows:
"In all cases where a change occurs in the ownership of land or water bottoms as a result of the action of a navigable stream, bay or lake in the change of its course or bed, or as a result of accretion, dereliction, or other condition resulting from the action of a navigable stream, bay or lake, the new owner of such lands or water bottoms, including the state of Louisiana, shall take the same subject to and encumbered with any oil, gas and/or mineral lease covering and affecting such lands or water bottoms, and subject to the mineral and royalty rights of the lessors in such lease, their heirs, successors and assigns, the right of the lessee or owners of such lease and the right of the mineral and royalty owners thereunder to be in no manner abrogated or affected by such change in ownership."
Placid contended that if the foregoing statute be found applicable, it is unconstitutional in that it violates its constitutional rights against deprivation of property without due process and impairment of the obligations of a contract. The Court of Appeal correctly rejected this contention and found Act 341 of 1952 constitutional and applicable in this case.
Hence, in accordance with Act 341 of 1952, any changes in the ownership of land or water bottoms after April 18, 1956, the date of the lease from the State to Gulf, is subject to and encumbered with said mineral lease insofar as it covers such lands or water bottoms as is clearly set forth in said statute.
The Court of Appeal then properly reversed the judgment of the district court to the extent that it cancelled and annulled State Lease No. 2963 granted to Gulf on April 18, 1956, insofar as it purports to affect the property described in the judgment and remanded the case for the limited purpose of establishing the ordinary low water line in the areas in controversy as of April 18, 1956 in order to determine the effect of State Lease No. 2963 to Gulf on land areas located on the water side of the ordinary low water line as determined to have existed on that date. The case was further correctly remanded for the purpose of ascertaining whether any judgment should be rendered against Placid and in favor of State-Gulf for the value of oil and gas which may have been produced from or attributable to the land areas in question located on the water side of the ordinary low water line as same is determined to have existed on April 18, 1956, as well as ascertaining the rights, if any, of Placid to be reimbursed for allocable drilling and operational costs of any of the three wells in question. The Court of Appeal further properly reversed that part of the judgment of the district court which recognized Placid, McDermott and Texaco as the owners of mineral leases affecting all of the property described in the judgment and remanded same for the purpose of determining what part, if any, of the land area in question is validly covered by State Lease No. 2963 dated April 18, 1956 to Gulf Refining Company, that is, on the basis of the ordinary low water line as same is determined to have existed on April 18, 1956.
Placid alternatively argues in its brief to this Court that, if it be determined that all or any part of the area in controversy is owned by the State of Louisiana as opposed to the riparian owners, who are Placid's lessors, it is the position of Placid that Gulf does not hold a valid lease from the State and that any part of the area in controversy owned by the State is covered and included in State Lease No. 3643 granted by the State to Placid on February 24, 1960. This issue was determined adversely to Placid by the Court of Appeal. We have reviewed the ruling of the Court of Appeal on this point and agree with its conclusion. Accordingly, the southern boundary of the Gulf lease, as corrected, is the original meander line; however, its effect, as previously indicated, extends only to the ordinary low water line as such is *167 determined on remand to have existed as of April 18, 1956.
For the reasons assigned, the judgment of the Court of Appeal is affirmed in all respects except as to the assessment of expert witness fees which is amended as hereinabove set forth.
BARHAM, J., dissents and assigns reasons.
TATE, J., dissents and assigns written reasons.
CALOGERO, J., dissents.
TATE, Justice (dissenting).
I respectfully dissent and subscribe to the reasons assigned by Mr. Justice BARHAM in his dissenting opinion.
BARHAM, Justice (dissenting).
The majority opinion in this case if it persists portends the most catastrophic effect of any case in recent years upon the public fisc, our natural resources, our ecology, our environment, and the public in general. The majority, under its holding, has deprived, or will deprive, this State and its people over the next few decades almost to a certainty, of nearly 200 square miles of public land which was the bottom of Grand Lake in 1812. Moreover, the rule of law laid down in the majority opinion, makes the loss incalculable if it is followed in cases affecting other bodies of water which we have always called "lakes". The majority decision has to stand, if at all, upon questionable interpretations of four Supreme Court cases and one Court of Appeal case. Miami Corporation v. State, 186 La. 784, 173 So. 315 (1936); Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943); Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431 (1946); Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957); and State v. Cockrell, 162 So.2d 361 (La. App.1st Cir. 1964).
The majority has decided that these cases force a conclusion that a lake is not necessarily a lake, that a lake may be a river or a stream. Amazingly, the result reached by the majority comes from inverse logic. The question presented to the majority was whether or not Civil Code Article 509 applied to Six Mile Lake, which is an undefinable part of the larger body of water called Grand Lake. Article 509 provides:
"The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion." (Emphasis supplied.)
and further provides that the alluvion belongs to the riparian owner on a river or a stream. Now, instead of deciding whether or not Six Mile Lake is a river or a stream to which the rule of alluvion would apply, the majority has put the cart before the horse and determined that they have found alluvion in Six Mile Lake, therefore, Six Mile Lake is "a river or other stream."
I find it most difficult to pen an articulate dissent in this case because everything which needs to be said has been said so many times before. It is true that in Louisiana the bottoms of navigable waters are owned by the State, and most authorities conclude this ownership flows from the inherent sovereignty of the State when it became a part of the United States in 1812. See Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); State v. Richardson, 140 La. 329, 72 So. 984 (1916); and State v. Bozeman, 156 La. 635, 101 So. 4 (1924). Special provision has been made in our Civil Code so that upon navigable rivers and streams the State's ownership of the bottoms of these waters moves as the banks are changed by alluvion or dereliction. Civil Code Articles 509 and 510. No such provision is made in our Civil Code for changing State ownership of the bottoms of lakes. To the contrary, alluvion, with which we are concerned here, is specifically confined to non-lakes, i. e., to rivers or other streams.
*168 The majority admits "It is well settled that, under Article 509, accretions formed successively and imperceptibly on the shores of rivers or other streams, whether navigable or not, belong to the owners of the property to which they attach, but this is not the law in the case of lakes, bays and arms of the sea." For this proposition the majority cites the very same cases upon which it relies for determining that the law of alluvion set forth in Article 509 applies to the lake hereSix Mile Lake. As I previously said, they determine that Six Mile Lake is governed by Article 509 simply because they find that alluvion, which is the subject of that article, forms in Six Mile Lake.
The majority opinion rests first upon the Miami Corporation case, which they admit never decided the issue before us in the present case. The Miami Corporation case erred in holding that State v. Erwin, 173 La. 507, 138 So. 84 (1931), had overruled New Orleans Land Company v. Board of Levee Commissioners of Orleans Levee District, 171 La. 718, 132 So. 121 (1930). The cases cited in the Miami Corporation case for support do not, in fact, lend support to its holding or the holding here. The dissent of Mr. Chief Justice O'Niell in the Miami Corporation case best discusses and differentiates the various jurisprudential holdings and ably points to the error of the majority. State v. Bozeman, supra, relied upon by the majority in Miami, gives no succor to the majority opinion herein or in Miami. Bozeman found that although Cross Lake once had its high elevation mark at 172 feet, the lake waters had receded to such an extent that at the time of the suit the outlet of the lake drained (I suppose running waters) from the lake so there were no more than 2 feet of water in its deepest part at any time. During the summer months the lake was entirely dry. The court held, however, because Cross Lake had once been a lake with water which covered land up to the 172 ft. contour at high water, that land was retained by the State although dereliction had uncovered most of the land year-round, and all of the land for many months during the summer.
The majority here says of the Miami case:
"The Court then stated that: `* * * Having reached the above conclusion, it is unnecessary to consider the applicability of articles 509 and 510 of the Revised Civil Code to this case.' Thus, the lake stream issue was not presented in that case [Miami] for the obvious reason that the rule announced by the Court applied to any navigable water whether it was a lake, stream or otherwise."
Yet the majority concludes, and I believe correctly, that our sole issue in deciding whether to apply alluvion and dereliction to Grand Lake is whether it is a lake or a river or stream. The majority apparently agrees with me that the Miami v. State rule is erroneous. This leaves the majority with the two Amerada cases and Esso Standard Oil Co. v. Jones to support its lengthy dissertation upon why the provisions of Civil Code Article 509, dealing with alluvion on the shore of a river or other stream, has application to a fresh water lake.
We now examine the Amerada Petroleum cases, which must sustain the majority, if anything in the way of jurisprudence does. If we accept Amerada Petroleum Corporation v. State Mineral Board, and Amerada Petroleum Corporation v. Case, for what they say, then we will find a holding by that court that Grand Lake and Six Mile Lake are lakes. Those cases are concerned with the source water which flows into Grand Lake out of "the arm of Grand Lake." The court, referring to the arm of Grand Lake, said:
"* * * This latter body of water, is, in fact, a stream flowing between banks having all of the characteristics of a wide river, which appears to be only the widening of Bayou Crook Chene. This stream, called the arm of Grand Lake, then in turn connects with Grand Lake at a point where another stream *169 known as Chicot Pass, connecting Chicot Lake with Grand Lake, empties into Grand Lake. * * *" (Emphasis supplied.)
The Court then compares the relative insignificance of the widths of the arm of Grand Lake and of Grand Lake itself. The Amerada cases distinguish the two and sub silentio acknowledge Grand Lake to be a lake.
I must finally distinguish Esso Standard Oil Company v. Jones. That case dealt with Deer Park Bend, which was formerly the main course of the Mississippi River, but which, at the time of suit, carried the river water in a river current only part of the year because the main channel had changed its course. The court finitely defined Deer Park Bend:
"* * * There could be a good argument that it [Deer Park Bend] is a prong or a branch of the river and, therefore, a river, but there can be a distinction between a river and a stream. It would be more correct, in my opinion, under the facts in this case to say that this old channel is now a stream. Apparently the language of the Article acknowledges that there is a distinction between a river and a stream. Smaller streams may go completely dry in the summer and resume their flow with the coming of winter rains. They must still retain their status as streams and when they do flow any accretions by alluvion would belong to the riparian owners where that takes place." 233 La. at page 935, 98 So.2d at page 243. (Emphasis supplied.)
When finally one has dissected all of the jurisprudence, one must come to the conclusion that the most definite thing established is that Civil Code Articles 509 and 510 do not apply to navigable fresh water lakes or arms of the sea.
Writers have often referred to the fact that our Code does not contain the French Civil Code provision dealing with lakes. These writers have quickly said that the lakes referred to in Code Civil 558 are not of the nature of the lakes with which we are concerned. Writers have also stated that lakes in France, which have a continually flowing head water and discharge channel, are considered as a part of the river which forms the head water and the discharge channel. However, vast differences exist between such lakes in France and in the lakes with which we are concerned here in Louisiana. Most of the lakes in Louisiana, having rivers or streams as head waters and having continuous discharge, are shallow, cover tremendous land areas, and are often in the nature of marshlands. They are not the deep receptacles which are found in many other parts of our country and in France.
Our government has seen fit to drain, levee, dredge and channel for flood control and land reclamation in many of these water covered areas. The primary beneficiaries of these conservation and protection measures are the land owners whose property abuts the lakes. When lake bottoms are uncovered for these land owners' direct benefit, why should they be entitled to the newly uncovered land, in addition to the protective and conservative benefits they have already acquired? In Grand Lake and its environs, tremendous public works have been carried on for many years, trying to control the Atchafalaya River and the Mississippi River. Extensive levees have been built, new channels have been dredged. Eventually there will be a deep water channel, man-made, all the way through Grand Lake. It appears that our government intentionally and purposely is exposing and will continue to expose the land formerly covered by water which was Grand Lake. Eventually there may be only a narrow channel carrying all of the water in Grand Lake and leaving the lake bottom dry, as occurred in Cross Lake in State v. Bozeman, supra. All of the experts in this case admit that much of the alluvion formed in the lake results from the conservation, protection and reclamation efforts of the government. It is the *170 public who should benefit by retention of public ownership of the newly exposed land and not the land owners whose property adjoins these lakes.
There is no provision in law, and especially is there no provision in the Civil Code, which gives the riparian owner on fresh water lakes the right to claim lands once submerged or lands which attach by an accretion. The jurisprudence is all to the contrary, including the Amerada cases. See State v. Aucoin, 206 La. 787, 20 So.2d 136 (1944), and the cases cited at 206 La. 827, 20 So.2d 136.
Surely there are some lakes in Louisiana. The Erwin case said Calcasieu Lake, a tremendous expanse of water in Calcasieu Parish, is a lake. It has always been known as a lake. It is designated on official maps by every department of this State and of the United States, including the Corps of Engineers, as a lake. The same can be said for Grand Lake in Cameron Parish, as well as for the Grand Lake we consider here and its segment known as Six Mile Lake. Long Lake, which is a dry piece of land and has been for some time, was, and is a lake, insofar as ownership of its bed is concerned. State v. Aucoin, supra. There are literally thousands of square miles of land which were lake "bottom" in 1812, which this majority opinion says were and are merely stream "bottom".
It is of particular importance to note here that our words "river" and "stream" come from the French words "fleuve" and "rivière." Fleuve is a river like the Mississippi, the Red, the Black, and the Atchafalaya. Streams are those smaller running bodies of water which, according to the French, carried some kind of flotation. Amazingly, the majority has said, oh, of course, Grand Lake is not a river (a large body of water) it is a stream (a very small running riverlet or creek). It is impossible for my mind to conclude that a body of water, which is as much as 30 miles in length and 10 miles in width, is a mere stream or riverlet. The majority must be overruling Erwin with specificity since it discussed it so thoroughly, and there we were concerned with a body of water 18 miles long, over 4½ to 14 miles wide. I am of the opinion that State v. Erwin is a correct statement of the law applicable to this case.
Obviously, the redactors of our Code, who were very familiar with the French language, never intended rivieres to include such bodies of water as these. More, we must credit them with knowing that there were certain waters confined in such manner as to be designated as lakes, as opposed to rivers and streams. When they said alluvion applies only to rivers and streams, au contraire, they did not mean that alluvion applies to lakes. They needed no other article to clarify the explicit statement of law they enacted. Grand Lake is a large lake and Six Mile Lake, a segment of that lake, is also a lake. All geographers and engineers have designated the water area we consider as a lake. It has never been disputed until this very case. The United States Corps of Engineers has designated this area to be a lake.
I am of the opinion that neither alluvion nor dereliction apply to lakes. I am of the opinion that lakes may exist even though they have current consistently in a portion of their confines. I am of the opinion that lakes exist even when rivers or streams source them and empty them continuously. I am of the opinion that the geological information about velocity, capacity, power, force and thalweg, do not change a lake into a stream. As I understand the testimony and the record, and the majority appears to agree with my conclusion, these geological findings are merely "the physical characteristics of a running stream with the power, force and velocity to carry sediment and to form alluvion * * *."
The majority errs when it says because there is within this lake at certain points, power, force, and velocity sufficient to carry sediment and to form alluvion, then this lake becomes a stream within the meanings of Articles 509 and 510. As I said in the beginning, and have repeated, *171 and must repeat once more, we cannot determine that a body of water is a stream simply because alluvion will form. Conversely, we must determine if a body of water is a stream before we can determine that there is alluvion as defined by law. The law of alluvion applies only to rivers or streams. Since Grand Lake and Six Mile Lake are lakes, the alluvion formed there does not come under the legal principle applicable to alluvion formed in rivers or streams. This is the simple answer to the question of law posed here.
The illogical approach of the majority is convincing at first reading. Lesser artists at logic, as well as greater ones, have won many a debate by convincing their audience to accept the deduction which they wish to make, as the premise with which they should begin. Instead of following Article 509 and stating, "we begin with a premise that a body of water must be a river or creek or stream before the laws of alluvion can apply," the majority states the premise as assuming that where there is alluvion, the body of water where it is formed must be a stream. As artful as is the majority opinion, it must, upon close examination, fall because it is, in final analysis, not only bad logic, not only contrary to the jurisprudence, but more particularly it is contrary to the Civil Code.
Regarding lakes such as Calcasieu, Grand Lake in Cameron, the Grand Lake and Six Mile Lake segment we now consider, I am of the opinion that the high water mark of 1812 forever sets the boundary for landowner and for water bottom ownerthe State. Neither can gain or lose because of water retrenching or encroaching because of land, submerging or emerging. When lake water covers private land, the land covered remains as part of the title of the riparian landowner. His exercise of dominion and use of the land under that water are nevertheless subject to State control to the extent it is necessary to protect navigable water interests of the State. Not only the land, but the mineral rights and the other appurtenances remain in full title with the landowner. To this extent, I am of the opinion that the jurisprudence which says that the State must always own the water bottom, even though the new bottom is formed by recession of waters or displacement of land mass, is incorrect as applied to lakes. Navigable rivers and streams and their water bottoms, as covered in a given time, are the land owned by the State, according to the provisions of Articles 509 and 510 of the Civil Code.
We adopt ownership of water bottoms as one means of controlling the waters themselves, their navigability, the fishing rights and the other rights of the public. Ownership of the water bottom is not necessary to the exercise of these police powers for the public's good. The State may find its lake waters encroaching upon private land, yet ownership of that newly covered land may still vest in the riparian owners. Nevertheless, the State can control the surface water rights for the public's good. If the State gains land by recession of lake water, it retains that land for the public's good. See State v. Aucoin, supra.
In this day and time, when environment, ecology, and conservation of natural resources are of such vital concern to the public, at this time when public lands and lands for the use in common are rapidly disappearing, at this time when society appears on the verge of desecrating the last vestige of the natural environment of this country, it is most important as a matter of public policy that we make every attempt to conserve for the public as much of the vital natural resources as the law will permit. Additionally, it seems unfair that the owner of a few acres of riparian land may acquire so much State land simply because the government tries to protect the public from floods, and to reclaim resources unusable in the present state. The riparian owner should not suffer if there is an encroachment of public lake waters upon his land, but neither should he benefit while the rightful beneficiary, the public, is milked of public monies and public resources. *172 Public policy demands here coincide with the positive legal mandate of the Code.
I reiterate that the rule of law stated in State v. Erwin correctly interprets and applies our Code provisions. I adopt as part of my reasons for dissent, the dissent of Chief Justice O'Niell in Miami Corporation v. State.
I respectfully dissent.

ON REHEARING
SANDERS, Chief Justice.
We granted a rehearing in this case because of the importance of the legal issues to the people of the State of Louisiana. Although the bare controversy between the State and defendants is the ownership of a tract of land located below the high-water mark of Grand Lake-Six Mile Lake in St. Mary Parish, the decision has far-reaching consequences, affecting that State's natural resources, ecology, and the public fisc.
For the purposes of rehearing, the facts set forth in the original opinion may be summarized. The State of Louisiana, joined by Gulf Oil Corporation, its lessee, seeks to be declared the owner of an area of land, on which several oil wells are located, lying below the high-water mark of a large body of water known as Grand Lake-Six Mile Lake in St. Mary Parish, adjacent to Sections 49, 50, and 68, Township 15 South, Range 11 East. In 1812, when Louisiana was admitted into the Union, Grand Lake-Six Mile Lake was navigable. The areas in dispute are referred to as the Woodland Tract, Barnetts Cove, and The Island area. As found on original hearing, the Woodland tract is part of the bank of the water body. The record discloses that the remaining area was as late as 1935 a part of the bottom of Grand Lake. During the ensuing years, however, sedimentary deposits caused a buildup, transforming the area into alluvion lying below the ordinary high-water mark. A fair inference, we think, is that the sedimentary deposits were accelerated by the channeling and dredging performed by governmental agencies as part of an extensive water-resource program.
Although State-Gulf makes a most persuasive argument that the land formation in the Barnett and Island areas is not alluvion, we accept the findings of the lower courts that it is alluvion, that is, accretions formed successively and imperceptibly on the shore. See LSA-C.C. Art. 509.
As correctly noted in our original opinion, the State of Louisiana upon its admission to the Union acquired title to all lands within its boundaries below the ordinary high-water mark of navigable bodies of water, with the power to determine the rights of riparian owners. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); State v. Richardson, 140 La. 329, 72 So. 984 (1916).
Through statutory provisions, the State of Louisiana has defined the rights of riparian owners.
As to navigable rivers and streams, the State holds in its sovereign capacity all the land that is covered by water at its ordinary low state. The bank belongs to the owner of the adjacent land, subject to public use. LSA-C.C. Arts. 455, 457; Wemple v. Eastham, 150 La. 247, 90 So. 637 (1922). As to lakes, the State has never ceded, and still holds, the land below the ordinary high-water mark. See LSA-C.C. Art. 455; State v. Aucoin, 206 La. 786, 20 So.2d 136 (1944); State v. Bozeman, 156 La. 635, 101 So. 4 (1924); State v. Capdeville, 146 La. 94, 83 So. 421 (1919); Milne v. Girodeau, 12 La. 324 (1838).
Article 509 of the Louisiana Civil Code, regulating the ownership of alluvion, provides:
"The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion.

*173 "The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or stream, and whether the same be navigable or not, who is bound to leave public that portion of the bank which is required by law for the public use."
By its terms, the foregoing article applies only to rivers and other streams. Thus, alluvion formed on the shores of rivers or streams belongs to the adjacent landowners. The principle of accretion, however, is inapplicable to lakes. As to lakes, the adjacent landowners have no alluvial rights. Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957); Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431 (1946); Zeller v. Southern Yacht Club, 34 La.Ann. 837 (1882).
The crucial determination is whether at the time of Louisiana's admission to the Union, Grand Lake-Six Mile Lake was a stream or lake. If it was a stream, the banks belong to the riparian owners, and the law of accretion applies. Thus, the disputed land would belong to the adjacent landowners. If, on the other hand, it was a lake, the banks are state-owned and accretion is inapplicable. Thus, the disputed land would belong to the State in its sovereign capacity.
On original hearing, in holding that Grand Lake-Six Mile Lake was a stream, as distinguished from a lake, we stated:
"[A] body of water through which a current flows or runs with such capacity and velocity and power as to form accretions is characterized as a river or stream, depending upon all attending circumstances, for the purpose of applying the rules of accretion and dereliction set forth in Articles 509 and 510 of the Civil Code."
We now think we erred in holding the body of water to be a stream, primarily because of two basic errors:
(1) In holding that Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943) overruled State v. Erwin, 173 La. 507, 138 So. 84 (1931).
(2) In giving undue weight to the existence of water current capable of forming accretions as a basis of classification.
In State v. Erwin, supra, this Court was concerned with the classification of Calcasieu Lake in Cameron Parish as a lake, river, or stream. That body of water was 18 miles long and varied in width from 4½ to 14 miles. The Calcasieu River traversed the water body from north to south, then continued its flow toward the Gulf of Mexico. At times, there were perceptible currents in the water, and it was affected by tides.
In holding that the water body was a lake rather than a stream on original hearing, this Court stated:
"In our opinion, however, the better viewwith reference to the laws, governing alluvion and derelictionis to regard such a vast expanse of water as Calcasieu Lake as being in fact a lake, although a river empties into the sea through it." (138 So. at 86)
On rehearing, the Court adhered to the holding that the body of water was a lake.
In Miami Corporation v. State, 186 La. 784, 173 So. 315 (1937), this Court dealt with the stream-lake classification of Grand Lake in Cameron Parish. The Court described it as a "navigable body of running water." It was about ten miles long and from three to nine miles wide. The Mermentau River flowed into and out of the lake. There was sufficient current to carry sediment. The Court overruled State v. Erwin, supra, as to a point not pertinent here. In holding the body of water to be a lake, however, it reaffirmed the Erwin lake classification, stating: "Grand Lake, like Calcasieu Lake, was a navigable lake, when Louisiana was admitted to the Union in 1812." (173 So. at 319).
*174 Amerada Petroleum Corporation v. State Mineral Board, supra, referred to as First Amerada, dealt with the Arm of Grand Lake. In describing its characteristics, the Court contrasted it to Grand Lake, the body of water to be classified here, stating:
"This ... body of water is, in fact, a stream flowing between banks having all of the characteristics of a wide river, which appears to be only the widening of Bayou Crook Chene. This stream, called the arm of Grand Lake, then in turn connects with Grand Lake at a point where another stream known as Chicot Pass, connecting Chicot Lake with Grand Lake, empties into Grand Lake. The stream known as the arm of Grand Lake has a width between banks of 3,960 feet at its northern point and 4,400 feet at a point opposite Lot 4 of Section 31, Township 11 South, Range 10 East. This width is relatively insignificant as compared to the width of Grand Lake, and this width between banks negatives the idea that it is a lake instead of a widening branch or fork of the Atchafalaya River. Also emptying into the body of water known as the Arm of Grand Lake is a bayou known as Bayou Nimrod, which connects with Bayou Chene through a connection with another bayou known as Dead Man's Bayou, and Bayou Chene, with which Bayou Nimrod is thus connected, is clearly one of the forks of the Atchafalaya River, and Bayou Nimrod itself is also another fork of the Atchafalaya River." (14 So.2d at 71)
The Court concluded:
"The trial judge held that the arm of Grand Lake is a stream of flowing water and that Article 509 of the Civil Code applies to the alluvion on its banks. Regardless of the characterization of the water as a river or merely as a flowing stream, the conclusion reached by the trial judge is correct." (14 So.2d at 72)
First Amerada makes only one reference to State v. Erwin, supra. That reference is not to overrule, but to distinguish. The Court stated:
"The cases of State v. Erwin, 173 La. 507, 138 So. 84, and Miami Corporation v. State, 186 La. 784, 173 So. 315, also are referred to in their brief by counsel for appellants as authority for the contentions urged by them, but neither of these cases is decisive of the question involved in this case." (14 So.2d at 72)
Our examination of First Amerada convinces us that it accomplished no overruling of State v. Erwin. Rather, it considered the characteristics of the particular water body, bearing no resemblance to that involved in Erwin, and classified it as a flowing stream or river.
Amerada Petroleum Corporation v. Case, supra, Second Amerada, involved part of the identical alluvion dealt with in First Amerada. The Court held that the earlier decision controlled.
In 1951, after the Amerada decisions, this Court had before it Doiron v. O'Bryan, 218 La. 1069, 51 So.2d 628 (1951), involving Calcasieu Lake, the same water body classified as a lake in State v. Erwin. Although the Court referred to the overruling of State v. Erwin in the Miami Corporation case on the extraneous point, it adhered to the Erwin holding as to the lake classification, stating:
"The case at bar, nonetheless, involves a navigable lake to which these rules of riparian ownership do not apply." (51 So.2d at 632)
The only remaining case cited by the defendants as repugnant to State v. Erwin is Esso Standard Oil Company v. Jones, supra. There, a cut-off was dredged across the neck of a large loop (Deer Park Band) in the Mississippi River. When the water of the river was diverted into the cut-off, alluvial deposits were made in the loop. The Court held that the alluvion, on the river loop, belonged to the riparian owner. *175 State v. Erwin was not cited in the decision. Because of the physical characteristics of the river loop, no conflict with the prior decision can be noted.
We conclude, contrary to our first impression, that the holding of State v. Erwin as to the classification of lakes has not been overruled.
It is true that sectors of the Court's language in several of the above cases focus strongly upon the existence of accretion-forming current in the water body. When these decisions are read as a whole, however, it is evident that the Court considered, not one, but several characteristics of the water body in making its classification. Our synthesis of these cases yields a conclusion that the existence of accretion-forming current is not, by itself, decisive of a stream classification. As noted in the dissenting opinion on original hearing, a holding that accretion-forming current alone is determinative that the water body is a stream would mean that all alluvion on all water bodies accrues to the riparian owners, contrary to the intent of Article 509, the formal expression of legislative will.
In our opinion, the jurisprudence, as well as the expert testimony, supports a multiple-factor test for classifying a water body as a lake or a stream. A judgment must be based upon a consideration of pertinent characteristics. Among these are the size, especially its width as compared to the streams that enter it; its depth; its banks; its channel; its current, especially as compared to that of streams that enter it; and its historical designation in official documents, especially on official maps. See State v. Erwin, supra; Miami Corporation v. State, supra; Amerada Petroleum Corporation v. State Mineral Board, supra; Esso Standard Oil Company v. Jones, supra; Amerada Corporation v. Case; supra; Zeller v. Southern Yacht Club, supra. State v. Jefferson Island Salt Mining Company, Inc., 183 La. 304, 163 So. 145 (1935); Gulf Refining Company v. Grace, 165 La. 979, 116 So. 405 (1928); State v. Bozeman, 156 La. 635, 101 So. 4 (1924).
Considering these factors in the present case, we find that Grand Lake-Six Mile Lake is one of the five largest water bodies in Louisiana. From earliest times, it has been designated on official maps as a lake. In 1812, at the time Louisiana was admitted to the federal union, the body was also known as Lake Chetimaches or Lake Sale (Salt Lake). It was about 30 miles long by 3 to 10 miles wide. It had a "Thalweg depth of only 8 feet."
The water body was subject to the ebb and flow of the tide. Because of the tidal action, the water was brackish and populated by salt water fish.
The record reflects that Grand Lake is about 20 times wider than the Atchafalaya River, which enters it; that currents are reduced substantially in the lake; that 75% of the sedimentation is deposited in the lake, and only 25% is carried out.
In summary, Grand Lake-Six Mile Lake is a wide, irregularly shaped body of water of great size, relatively shallow in depth, with a current substantially slower than that of the inflowing river. In its main characteristics, it is similar to Lake Pontchartrain and Lake Calcasieu. Historically, it has always been designated as a lake.
We hold that it was a lake in 1812, when Louisiana was admitted to the Union. Accordingly, it must now be classified as such. It follows under the principles already announced that the State owns its banks and that the accretion rule of Louisiana Civil Code Article 509 is inapplicable to it.
The defendants, however, assert on rehearing that the recent decision of the United States Supreme Court in Bonelli Cattle Co. v. Arizona, 414 U.S. 313, 94 S. Ct. 517, 38 L.Ed.2d 526 (1973) requires that the defendants be recognized as the owners of the disputed property, whether *176 the water body be classified as a navigable stream or a lake.
The circumstances that gave rise to the Bonelli case are as follows. In 1910, prior to Arizona's admission to the union, the United States government patented the subject land as part of a larger parcel to the Sante Fe Pacific Railroad Company. The parcel abutted the east bank of the Colorado River. Upon Arizona's admission to the Union in 1912, the State acquired title to the bed of the Colorado River. In 1955, the Bonelli Cattle Company acquired title to the subject property. By 1959, however, because of the gradual eastward movement of the river, eroding the east bank and depositing alluvion on the west bank, the subject property was covered by water and became part of the state-owned riverbed. In 1959, a federal Bureau of Reclamation project for the building of Hoover Dam rechanneled the Colorado River, withdrawing it from the subject land.
The Arizona Supreme Court held that the State was not divested of the title to the land and that the State still owned the resurfaced land to a former high-water mark, the ordinary high-water mark as it existed in 1938, before the operation of Hoover Dam reduced the water flow.
The United States Supreme Court held that federal law rather than state law applied. As to the applicable law, the Court stated:
"The present case, however, does not involve a question of the disposition of lands, the title to which is vested in the State as a matter of settled federal law. The very question to be decided is the nature and extent of the title to the bed of a navigable stream held by the State under the equal-footing doctrine and the Submerged Lands Act. In this case, the question of title as between the State and a private landowner necessarily depends on a construction of a `right asserted under federal law.'"
On the merits, the Court held that the riparian owner regained title by accretion, holding:
"The advance of the Colorado's waters divested the title of the upland owners in favor of the State in order to guarantee full public enjoyment of the watercourse. But, when the water receded from the land, there was no longer a public benefit to be protected; consequently, the State, as sovereign, has no need for title. That the cause of the recession was artificial, or that the rate was perceptible, should be of no effect.
"Nor does the Submerged Lands Act provide a basis for the State's claim to the subject lands. The Arizona Supreme Court incorrectly construed this Act as a grant by Congress to the States of lands `formerly beneath navigable waters.' The Act did not abrogate the federal law of accretion, but defined lands beneath navigable waters as being those covered by streams as `hereafter modified by accretion, erosion, and reliction.' Contrary to the implication raised by the Arizona Supreme Court, the Submerged Lands Act creates no new rights for the States in the beds of their inland waterways. The Act is not a grant of title to land by only a quitclaim of federal proprietary rights in the beds of navigable waterways. The Act specifically excepts from its scope lands lawfully conveyed or patented by the United States. Since the Act does not extend to the States any interest beyond those afforded by the equal-footing doctrine, the State can no more base its claim to lands unnecessary to a navigational purpose on the Submerged Lands Act than on that doctrine." (414 U.S. at 323, 94 S.Ct. at 525, 38 L.Ed.2d at 537-538)
As we view it, the Bonelli decision is inapplicable to the present case. The area in dispute there, once privately owned, was no longer part of the river bed. The Court found it to have a location *177 above the present high-water mark.[1] The instant case involves a bank area and alluvion below the present ordinary high-water mark of the lake. Unlike the land in Bonelli, the title to the disputed area here is vested in the State "as a matter of settled federal law." See Arkansas v. Tennessee, 246 U.S. 158, 38 S.Ct. 301, 62 L.Ed. 1213 (1917); Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Hardin v. Jordan, 140 U.S. 371, 11 S.Ct. 808, 35 L.Ed. 428 (1891).
It follows that in the present case state law governs the rights of riparian owners. Bonelli Cattle Co. v. Arizona, supra; Arkansas v. Tennessee, supra; Shively v. Bowlby, supra.
In Bonelli Cattle Co. v. Arizona, supra, the United States Supreme Court reaffirmed the state-law principle, stating:
"We continue to adhere to the principle that it is left to the States to determine the rights of riparian owners in the beds of navigable streams which, under federal law, belong to the State." (414 U.S. at 319, 94 S.Ct. at 523, 38 L.Ed.2d at 535)
Finally, we recognize that our present holding is contrary to the decision of the intermediate Court of Appeal in State v. Cockrell, 162 So.2d 361, cert. den. 246 La. 343, 164 So.2d 350 (1964). That decision, of course, has already been weakened by the recorded opinion of its author that the decision is in error. See State v. Placid Oil Company, La.App., 274 So.2d 402, 422 (dissenting opinion). We reject that decision as unsound.
As was noted on original hearing, the defendants filed several exceptions. They were overruled by the trial court, and the Court of Appeal affirmed. We find no error in these rulings for the reasons assigned below.
Consistent with the views expressed, we hold that the State of Louisiana owns the disputed areas, located below the ordinary high-water mark of Grand Lake-Six Mile Lake, subject to the rights of its mineral lessee, Gulf Oil Corporation.
For the reasons assigned, the judgment of the Court of Appeal, insofar as it decreed the defendants to be the owners of the area hereinafter described, is reversed. Judgment is rendered in favor of plaintiffs, State of Louisiana and Gulf Oil Corporation, against Placid Oil Company, J. Ray McDermott & Co., Inc., and all other defendants decreeing the State of Louisiana to be the owner of the property covered by State Lease 2963, dated April 18, 1956, to Gulf Oil Corporation, being more particularly described as follows:
Commencing at a point on the present shore line of Six Mile Lake at its intersection with the boundary line between Sections 66 and 67, Township 15 South, Range 11 East, which point is also the Southwest corner of State Lease No. 2940, thence (for the Eastern boundary of the area herein described) running North 4700 feet to the South boundary line of State Lease No. 1392, thence West 9900 feet along the South line of said State Lease No. 1392 to a point for a corner; thence South to the original South shore line of Six Mile Lake, and thence in an Easterly, Southeasterly and Northeasterly direction following the meanders of the original South shore line of said Six Mile Lake to the Eastern boundary of the area herein described; being all of the area between the East and West boundaries thereof hereinabove set forth and extending from the North boundary thereof South to the original shore line of Six Mile Lake, said original shore line herein referred to being as shown on plat on *178 file in State Land Office and attached to State Lease 2963 to Gulf Oil Corporation, dated April 18, 1956, duly recorded in the Conveyance Records of St. Mary Parish, Louisiana.
It is further ordered, adjudged, and decreed that the Placid Oil Company and J. Ray McDermott & Co., Inc., in solido, make an accounting to the plaintiffs for the oil, gas, and other minerals removed from said land, including the oil produced by the wells located on said property designated as S. G. Todd Wells 3, 4 and 5. For the purpose of the accounting, the case is remanded to the Sixteenth Judicial District Court for the Parish of St. Mary for further proceedings consistent with the views herein expressed.
The fees of the following expert witnesses are fixed in the following sums and taxed as costs:

Dr. John P. McDowell $2,800.00
Dr. Willis A. Eggler 2,300.00
Dr. R. Kazmann 350.00
Prof. R. A. Steinmayer 3,700.00
William Clifford Smith of the
 firm of T. Baker Smith &
 Son, Inc., Civil Engineers
 and Surveyors 9,000.00
Philip Whitaker of the firm of
 F. Shutts' Sons, Civil
 Engineers 12,500.00
Louis C. Peters of the firm of
 Barnett & Peters, Consulting
 Foresters 2,700.00

The fees of other expert witnesses are affirmed as fixed in the lower court.
All costs of court are assessed against the defendants, Placid Oil Corporation and J. Ray McDermott & Company, Inc., in solido.
SUMMERS, J., dissents and assigns reasons.
DIXON, J., dissents.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I dissent. I adhere to reasons set forth in the original opinion.
SUMMERS, Justice (dissenting).
In 1964 we approved a finding that Six Mile Lake in St. Mary Parish was a stream. State v. Cockrell, 162 So.2d 361 (La.App.1964), cert. denied, 246 La. 343, 164 So.2d 350 with these reasons: "On the facts found by the Court of Appeal we find no error of law in the judgment complained of." Ten years later, by this decision, on the same facts, we change the rule of law and hold that the same body of water is now a lake. Not only is this the identical body of water, the accretion involved here is in close proximity to the accretion in the Cockrell Case. The strange paradox resulting from the decision gives defendant's neighbors in the Cockrell Case a short-distance upstream title to the accretion and denies a like accretion to defendants.
To accomplish this result, the Court has held that the 1931 decision of State v. Erwin, 173 La. 507, 138 So. 84, was not supplanted by a series of cases which followed. These later cases established the rule of law applied in the Cockrell Case to classify Six Mile Lake as a stream. See Amerada Petroleum Corporation v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943), later recognized in Amerada Petroleum Corporation v. Case, 210 La. 630, 27 So.2d 431 (1946) and Esso Standard Oil Company v. Jones, 233 La. 915, 98 So.2d 236 (1957). In effect the Court has resurrected the Erwin Case from the ineffective status to which it was assigned by later rulings.
The wells involved in this case were located and drilled on the faith of the principles of property law announced and applied in the first Amerada Case and fully recognized *179 in the other cited cases. The return to the Erwin rule brings about a retroactive change in the law which was unpredictable in terms of relevant precedents. As a result, defendants have been deprived of their property without due process of law; and this decision results in the taking of private property for public use without compensation, all in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 2 of the Constitution of Louisiana.
In setting aside our original decision, the Court asserts that undue weight was given "to the existence of water current capable of forming accretions as a basis for classification." This holding despite the fact that water currents are the natural phenomena of all streams and their most dominant characteristic.
In reviving and applying the Erwin rule, the Court cast aside the established jurisprudence of this State for a period in excess of thirty years and reached a decision in direct conflict with the doctrine of accretion long recognized by Articles 455, 509 and 510 of the Civil Code. To reach its result the Court leaned heavily on broad considerations of ecology, environment and the public fisc, matters not at issue in the case and concerning which there are no findings of fact supported by this record.
The so-called "multiple factor test" adopted by the Court for classifying water bodies is in effect a statement of the rule of the Erwin Case. In my view the classification of Six Mile Lake as a "Lake" under that test was erroneous and invalid for several reasons.
The finding by the trial court and the Court of Appeal and this Court on original hearing that Six Mile Lake annually carries off a substantial portion of the tremendous volume of water flowing to the sea through the Atchafalaya River has not been changed on rehearing. This determination remains the principal and crucial factual finding of this case. The official state map dramatically illustrates that Six Mile Lake forms an integral part of the dynamic water system of the Atchafalaya Basin, vividly underscoring its capacity as a body of running water of tremendous force.
The laws of accretion were intended to have particular application to water bodies capable of carrying and depositing sedimentary loads and capable of changing their shorelines. Bodies of running water fit into that category, and the history of our Code articles support this rationale.
In classifying Six Mile Lake as a lake the Court disregards the most important characteristic of a water body for the purpose of classification under Civil Code Article 509, that is, a moving or running body of water principally endowed with the capacity for change. Instead the Court has emphasized other physical features which are either not supported by the record or which have pertinence only in the limited fields of geology or cartography. And this notwithstanding the fact that the State expressly admitted in its application for writs that the issue before the Court was the classification of the water body under our laws relating to accretion and dereliction.
This reasoning of the Court is based upon the erroneous premise that if the capacity to form accretions is the test for classification, a minimal amount of accretion in any type of water body would satisfy the requirements of Article 509 of the Civil Code because the presence of accretions proves up the capacity to form them. This overly simplistic approach is irrelevant to the facts of this case. It disregards the admitted fact that Six Mile Lake is a dynamic body of water carrying a substantial portion of the waters of the Atchafalaya Basin to the Gulf. This approach requires classification of Six Mile Lake as a placid or immobile body of water having no real capacity for undergoing physical change. Nothing could be further from the facts. The characteristics of Six Mile Lake are otherwise.
*180 The Court's opinion is also based upon erroneous factual findings. The finding that Six Mile Lake has a thalweg of only eight feet is contrary to the Cathcart finding that immediately after Statehood the water body had a channel of four and one-half fathoms, or twenty-seven and one-half feet.
A finding that Six Mile Lake is subject to tidal action and has brackish water does not detract from its classification as a stream when it is noted that the Mississippi River at New Orleans is also subject to tidal action and has brackish water. It is also error to compare Six Mile Lake to Lake Pontchartrain and Lake Calcasieu. Six Mile Lake has a different shape, configuration, watershed and the dynamics of its water system are strikingly dissimilar. While the Court's finding that Six Mile Lake is one of the five largest water bodies in Louisiana, many times larger than the river that enters it and that it has been designated as a lake on official maps may be correct, these considerations do not detract from the fact that it is a body of running water with capacity to form accretions, characteristics which make it, in natural and legal contemplation, a stream.
It is error for the Court to hold that the State's title extends to the ordinary high water line of Six Mile Lake as it existed when the State was admitted to the Union in 1812 as opposed to the present ordinary high water line. Title to the area between these two elevations involves a federal question determinable under federal law. Bonelli Cattle Company v. Arizona, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973).
I respectfully dissent.
NOTES
[1] Application for writ of review was denied without dissent by this Court with the following notation: "On the facts found by the Court of Appeal, we find no error of law in the judgment complained of." 246 La. 343, 164 So.2d 350 (1964).
[1] In a supplemental brief, defendants contend from maps appearing in the State court decisions that the disputed area was located below the high-water mark. The maps are unclear on this point. In any event, the United States Supreme Court adjudicated on the basis that "the State of Arizona will continue to hold title to the bed ... to its present high-water mark." (414 U.S. at 322, 94 S.Ct. at 524, 38 L.Ed.2d at 536-537)