563 So.2d 401 (1990)
DAVIS OIL COMPANY
v.
The CITRUS LAND COMPANY, et al.
No. CA 89 0489.
Court of Appeal of Louisiana, First Circuit.
May 30, 1990.
Rehearing Denied July 18, 1990.
*402 F. Henry Lapeyre, Jr. and Matthew J. Randazzo, III, New Orleans, for plaintiff/appellee.
David C. Kimmel, Asst. Atty. Gen. and Gary L. Keyser, Dept. of Justice, Baton Rouge, for State Mineral Bd. (appellant).
Robert L. Cabes, Lafayette, for Citrus Land Co. and its various shareholders.
Before LOTTINGER, CRAIN and LeBLANC, JJ.
LOTTINGER, Judge.
This is an appeal from a judgment in a concursus proceeding instituted by Davis Oil Company[1] (Davis) to determine the ownership of funds representing royalty proceeds from two wells identified as Davis-S/L 9224, No. 1 and Davis-S/L 9224, No. 2, as these wells are affected by Unit Nos. 1162-A-2 and 1162-D, designated as the Tex W 12,800' Sand and the Tex W 12,400' Sand. The ownership of the funds representing the royalty proceeds necessarily depends on a determination of title to an area of accretion located at the mouth of Shell Island Pass, a small bayou running between Shell Island and Section 11, Township 18 South, Range 11 East in St. Mary Parish, Louisiana, near the mouth of the Atchafalaya River. In essence, the royalty proceeds at issue here, which at the time of trial exceeded one million dollars, belong to the owner of the accreted area in dispute.[2]
Both the State of Louisiana, who owns the surrounding waterbottoms, and Citrus Land Company (Citrus) the owner of the land adjacent to the accreted area, claim to own the disputed tract. The trial court held in favor of Citrus, and the State has appealed devolutively.

FACTS
Davis obtained State Lease 9224 from the State of Louisiana covering an area which includes the accretion at issue on January 19, 1987, and thereafter drilled the aforementioned wells. The No. 1 well turned out to be dry, but the No. 2 well, which is located on the accreted area, is productive.
Following a title examination conducted in connection with the No. 2 well, Davis also obtained a lease covering the accreted area from Citrus. Both the State lease and the Citrus lease provide for the same percentage of royalties to the lessor, and both purport to cover the accreted area.
Once production began from the No. 2 well, Davis, Citrus, and the State entered into an agreement whereby proceeds attributable to the royalty interest owed to the owner of the accreted area would be deposited in the registry of the Court and placed in escrow pending an attempt to determine title. No agreement could be reached and Davis filed this concursus proceeding in August of 1985.
The area of accretion in dispute is alluvion which has built up slowly and imperceptibly *403 near the mouth of Shell Island Pass in an area of Atchafalaya Bay known as Little Bay. It may be characterized as a peninsula like extension of the right descending bank of Shell Island Pass into Little Bay, or what is commonly known as a delta.[3] As this delta extends out into the bay, it curves sharply to the west. It is completely covered by normal high tide, but is exposed at low tide.[4]
The evidence was overwhelming and testimony uncontradicted that the delta which would normally build up on the opposite side of the channel and extend the left descending bank of Shell Island Pass into the bay is almost non-existent and is not exposed above water even at low tide. This is due to strong cut-bank currents emanating from the mouth of the Atchafalaya River just to the east of the mouth of Shell Island Pass.

APPLICABLE LAW
La.Civ.Code arts. 499 and 500 provide for ownership of alluvion that has built up on the banks or shores of various bodies of water. They provide:
"Art. 499. Alluvion and dereliction
"Accretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion. The alluvion belongs to the owner of the bank, who is bound to leave public that portion of the bank which is required for the public use.
"The same rule applies to dereliction formed by water receding imperceptibly from a bank of a river or stream. The owner of the land situated at the edge of the bank left dry owns the dereliction."
"Art. 500. Shore of the sea or of a lake
"There is no right to alluvion or dereliction on the shore of the sea or of lakes."
Therefore, if the disputed tract has built up on the bank of a river or stream, it belongs to Citrus, the riparian landowner. But if the disputed tract has built up on the shore of the sea, or a lake, it belongs to the State.
With these precepts in mind the factual and legal issues upon which this case turns become clear. First, on which bank or shore did the alluvion build up? That of Shell Island Pass or of Little Bay? Second, how is the bank or shore upon which the alluvion was deposited classified? As a river/stream bank or a sea/lake shore?
The first of these issues is a factual one. On which bank or shore did the alluvion at issue build up? The trial court did not expressly rule on this issue. The trial court held that the disputed tract was the bank of Shell Island Pass, not that it had built up on, or was deposited on, the bank of Shell Island Pass. However, for the purpose of this opinion, we will treat this as a holding that the alluvion at issue built up on the bank of Shell Island Pass.
Nor did the trial court expressly rule on the second issue, i.e. how is the bank or shore upon which the alluvion was deposited classifiedas a river/stream bank or as a sea/lake shore? However, since the ownership of the disputed tract was awarded to Citrus, it is clear that the trial court considered the area upon which the alluvion was deposited to be the bank of a river or stream, and we will treat this as its holding.
Before considering the correctness of the trial court's resolution of these issues, we will consider the applicability of La.R.S. 38:2356(M)(2) upon which the trial court placed much emphasis. It provides:
"The area described in Section 2356(M)(1) [Atchafalaya Bay] is hereby permanently declared to be an arm of the sea and the laws of accretion and dereliction as defined in Civil Code Article 499 shall not apply; provided, however, as to other areas nothing herein shall be construed to affect the law of accretion and *404 dereliction as defined in Civil Code Article 499."
The trial court reasoned that since this act declares Atchafalaya Bay, of which Little Bay is a part, to be an arm of the sea, that the legislature must not have considered them to be an arm of the sea prior to the enactment of that statute. For if it did, then it would not have gone through the trouble to single out the area and designate it as an arm of the sea. The trial court thus implies, although it does not expressly hold, that by enacting La.R.S. 38:2356(M)(2), the legislature has decreed that Atchafalaya Bay was not an arm of the sea prior to July 12, 1974, the effective date of the statute. We do not subscribe to this view.
It is clear that subsequent to the enactment of this statute, Atchafalaya Bay is to be considered an arm of the sea and any accretion thereto after that date belongs to the State. However, the reverse is not necessarily true. Merely because the legislature formally declared Atchafalaya Bay to be an arm of the sea does not mean that previously it was not; regardless of whether or not the legislature thought it to be.[5] In any event, absent a specific declaration from the legislature, i.e. pre-1974, it is for the courts of this state to determine what is and is not an arm of the sea.
The trial court found, and we agree, that the area in dispute was built up above low tide prior to July 12, 1974, the effective date of La.R.S. 38:2356(M)(2). Thus, the disputed area does not belong to the State pursuant to § 2356(M)(2), as the statute was not yet in effect when the disputed area came into legal existence.[6] Therefore, La.R.S. 38:2356(M)(2) has no application to the facts and issues before us. However, this does not mean that the disputed area does not belong to the State pursuant to Articles 499 and 500.
We also feel compelled to comment on the express holding of the trial court, that the accreted area is an extension of the left descending bank of Shell Island Pass.
While this holding may possibly be correct,[7] it is not relevant to the determination of the issues before us. This is so because the disputed tract is comprised of alluvion deposited at its present location by the sediment laden waters of Shell Island Pass as they entered the bay and began to spread out and slow down. The ownership of alluvion is expressly provided for by Articles 499 and 500 of the Civil Code. The fact that at some point, i.e. when it builds up enough to be exposed at low tide, it either becomes the bank of the river as it extends out into the bay, or becomes seashore[8], is irrelevant to the determination of who owns it. In determining the ownership *405 of alluvion, how the alluvion itself is classified is immaterial; it is the classification of the land upon which the alluvion built up on or is attached to that will determine the ownership of the alluvion.
Regardless of whether the alluvion at issue may be classified as the bank of a river or stream, or as seashore, it is first and foremost alluvion; and as such its ownership is determined by Civil Code Articles 499 and 500 and depends upon the classification of the area upon which it is deposited. Therefore, the ruling of the trial court that the disputed tract is an extension of the bank of Shell Island Pass is not dispositive of the question of its ownership.
Articles 499 and 500 provide in effect that if the alluvion is deposited on the bank of a river or stream, it belongs to the riparian landowner, and if it is deposited elsewhere, the State, as owner of the waterbottom it replaces, owns it.
We now turn to the trial court's resolution of the dispositive issues in this case. Upon what bank or shore was the alluvion at issue deposited, and how is that bank or shore classified?
Taking these issues in inverse order and utilizing the factors set out in State v. Placid Oil Company, 300 So.2d 154 (La. 1974), we have no problem classifying the bank/shore of Shell Island Pass and Little Bay. Under the test set out in Placid, Shell Island Pass is clearly a river or stream, and Little Bay is clearly not a river or stream. Thus, the bank of Shell Island Pass is a riverbank, while the shore of Little Bay is not.[9] Little Bay, as part of the Atchafalaya Bay, is directly open to the Gulf and is therefore either an arm of the sea or part of the sea itself. Since the shore of Little Bay fits the Codal definition of seashore and fronts directly on an arm of the sea, it follows that it is seashore. Therefore, if the alluvion at issue built up on the bank of Shell Island Pass, it belongs to Citrus, and if it built up on the shore of Little Bay, it belongs to the State.
The trial court found that the alluvion at issue built up on the bank of Shell Island Pass. As we have previously stated, this is a finding of fact. Factual findings by the trial court should not be overturned absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The alluvion at issue here is a peninsula, or delta, which extends seaward from the mouth of Shell Island Pass into Little Bay. At some point near the mouth of Shell Island Pass where the alluvion "connects" to the land before extending out into the bay, the bank of the river intersects with the shore of the bay.
The shore of Little Bay, as seashore, is a public thing, insusceptible of private ownership, while the bank of the river is a private thing subject to public use.[10] This being the case, where the riverbank intersects the seashore, the seashore, as a public thing insusceptible of private ownership, must prevail and the riverbank must yield to the seashore.
The riverbank ends at the high tide mark where the river meets the bay. The seashore extends all along the coast of Little Bay, between high and low tide. Therefore, the alluvion at issue here, insofar as it extends seaward from the mouth of Shell Island Pass into Little Bay, had to, as a matter of law, have built up on the shore of Little Bay. The trial court's holding to the contrary was manifestly erroneous. To hold otherwise would be to allow *406 what was once a public thing (navigable water bottoms) to become privately owned wherever a sediment bearing river enters the sea. This would be violative of both the Louisiana Constitution and the will of the Legislature. La. Const. Art. 9, § 3; La.Civ.Code art. 450; La.R.S. 49:3.
The State is the owner of alluvion which builds up on the shore of the sea, thus the State is the owner of the alluvion at issue. As owner of the disputed tract, the State is also the owner of the funds representing the royalty proceeds attributable to minerals produced from the tract and placed into the registry of the court. The trial court erred in awarding the royalty proceeds to Citrus.
Therefore, for the above and foregoing reasons the judgment of the trial court is reversed and this case is hereby remanded to the trial court for the purpose of rendering a judgment consistent with this opinion.
REVERSED AND REMANDED.
*407 
NOTES
[1] APC Operating Partnership, (APC), Davis' successor in title to the mineral leases and wells involved in this concursus, has replaced and superseded Davis by the way of intervention since the institution of this suit. Nevertheless, the stakeholder will be referred to in this opinion as Davis.
[2] In addition to the royalty proceeds placed into the registry of the court, the purchaser of the condensate produced from the No. 2 well erroneously paid the State the sum of $67,040.27 as royalties due the owner of the accreted area for the months of January through March of 1985. Although not deposited into the registry of the Court, these funds represent a part of the amounts in dispute, and belong to the owner of the accreted area.
[3] See Appendix A following this opinion.
[4] The parties stipulated that the accreted area was covered at high tide. Whether it was covered at low tide was a major issue at trial. Apparently the trial judge was of the opinion that it was exposed at low tide and we accept this finding as true for the purpose of this appeal, as it is supported by the weight of the evidence.
[5] For the record, and contrary to the trial court's interpretation, we are convinced, after reading the minutes of the pertinent committee meeting, that the legislative committee that recommended adoption of the 1974 amendments declaring Atchafalaya Bay to be an arm of the sea believed that it was already an arm of the sea when they recommended adoption. During the Committee meeting, the legislation was acknowledged to be remedial and not to change the law but only clarify it and insure that the State retain any areas of accretion as they form.

Minutes of the Senate Natural Resources Committee, May 30, 1974.
[6] This is assuming that La.R.S. 38:2356(M)(2) is not applied retroactively; an issue upon which we do not express an opinion.
[7] Assuming, without so holding, that the channel or thalweg which continues out into Atchafalaya Bay from the mouth of Shell Island Pass fits the definition of a river or stream based on the factors set out in State v. Placid Oil Company, 300 So.2d 154 (La.1973), on rehearing; cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); and that a "bank" can exist only on one side of such a river or stream, (the accretionary feature extending into the bay on the side of the left descending bank of Shell Island Pass can by no stretch of the imagination be considered a bank as it is submerged even at low tide) then the disputed tract would seem to fit within Art. 456's definition of a bank, i.e. it lies between the ordinary low and ordinary high water marks.
[8] La.Civ.Code art. 451 defines seashore as follows:

"Seashore is the space of land over which the waters of the sea spread in the highest tide during the winter season."
In Buras v. Salinovich, 154 La. 495, 97 So. 748 (1923), the Louisiana Supreme Court restricted this definition to land on the open coast that is directly overflown by the tides. The alluvion at issue here seems to fit this definition of seashore.
[9] Under Placid, it is irrelevant whether the shore of Little Bay is seashore or not; if it is not the bank of a river or stream, any alluvion thereto belongs to the state.
[10] La.Civ.Code Articles 450 and 456 provide:

"Art. 450. Public things
"Public things are owned by the state or its political subdivisions in their capacity as public persons.
"Public things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore....
"Art. 456. Banks of navigable rivers or streams
"The banks of navigable rivers or streams are private things that are subject to public use.
"The bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water. Nevertheless, when there is a levee in proximity to the water, established according to law, the levee shall form the bank."