576 So.2d 495 (1991)
DAVIS OIL COMPANY
v.
The CITRUS LAND COMPANY, et al.
No. 90 C 1832.
Supreme Court of Louisiana.
March 11, 1991.
*496 Robert L. Cabes, Robert L. Cabes, P.L.C., Lafayette, for The Citrus Land Co., et al. defendants-applicants.
Matthew Randazzo, III, F. Henry Lapeyre, Baton Rouge, for Davis Oil Co. plaintiff-respondent.
William J. Guste, New Orleans, David Kimmel, Gary Keyser, Baton Rouge, for State of Louisiana.
Oliver P. Stockwell, William E. Shaddock, William Boyce Monk, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, Randall C. Songy, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, amicus curiae.
COLE, Justice.
In this concursus proceeding, we are called upon to decide whether alluvion formed near the intersection of a river and a bay is owned by the riparian landowner or by the State. The trial court ruled in favor of the riparian landowner. The Court of Appeal, First Circuit, reversed and ruled in favor of the State. We now affirm in part, reverse in part, and remand to the trial court for further proceedings in accordance with our ruling.

FACTS
Davis Oil Company (Davis) obtained State Lease 9224 from the State of Louisiana covering an area which includes the alluvion at issue in this case. Under the lease, the State is to receive a certain percentage of the proceeds from any mineral production on the leased tract. After acquiring the lease, Davis drilled two oil wells, each of which is located on the disputed alluvion. The first well was dry, but the second well is productive. Following a title examination conducted in connection with the second well, Davis also obtained a mineral lease from Citrus Land Company (Citrus). Both the State lease and the Citrus lease provide for the same percentage of royalties to the lessor, and both purport to cover the disputed alluvion.
Once production began from the second well, Davis, Citrus, and the State entered into an agreement whereby proceeds attributable to the royalty interest owed to the owner of the alluvion would be deposited in the registry of the Court and placed in escrow pending an attempt to determine title to the alluvion. No agreement as to title could be reached, and Davis filed this concursus proceeding in August 1985. The ownership of the funds representing the royalty proceeds necessarily depends upon a determination of title to the alluvion.
The disputed tract consists of alluvion formed near the mouth of Shell Island Pass (a river), where the Pass intersects with Little Bay, which is itself an extension of Atchafalaya Bay.[1] The alluvion forms a peninsula-like extension of the right descending bank of Shell Island Pass, or what is commonly known as a delta. It formed slowly and imperceptibly as sediment flowing out of Shell Island Pass and the nearby Atchafalaya River dispersed and settled. The effect of the buildup is unique in this case because the extension of the right descending bank of Shell Island Pass into Little Bay is not mirrored on the left descending bank side of the Pass.[2] As the *497 delta extends out into Little Bay, it curves sharply to the west, and appears to have attached primarily to what was once the shoreline of Little Bay. The parties stipulated that the alluvion is covered by water at high tide, but the question of whether it is exposed at low tide was a major issue at trial.
The trial court held Citrus owned the disputed alluvion, but the manner in which it reached its ruling requires explanation. Recognizing that accretion which attaches to a riverbank belongs to the owner of the adjacent land, the trial court sought to determine the extent of the bank of Shell Island Pass as it existed in July 1974. The July 1974 date was pertinent, according to the trial court, because of La.R.S. 38:2351, et seq. These statutes create a permanent wildlife and recreation area within portions of the Atchafalaya Bay region. One of these statutes, R.S. 38:2356(M)(2), became effective July 12, 1974 and provides that the area described in R.S. 38:2356(M)(1) "is hereby permanently declared to be an arm of the sea and the laws of accretion and dereliction as defined in Civil Code Article 499 shall not apply."
The trial court interpreted the statute as an implicit legislative recognition that the area described in R.S. 38:2356(M)(1), which includes Little Bay, was not an "arm of the sea" prior to the effective date of R.S. 38:2356(M)(2). Consequently, the trial court deemed it crucial to determine the location of the disputed accretion in relation to the boundaries described in R.S. 38:2356(M)(1).[3] To determine the location of the statutorily defined boundary, the mean high water mark of the Atchafalaya Bay, the trial court had to draw a line which would "close off" Shell Island Pass.[4] To "close off" Shell Island Pass, the line had to be drawn across its mouth, which the court found had been extended by the alluvion. In effect, the trial court held that by July 12, 1974 the mouth of Shell Island Pass had been extended into Little Bay due to alluvial buildup. Thus, the court ruled that the entire disputed tract fell north of the line described in R.S. 38:2356(M)(1) and was, therefore, owned by Citrus, the riparian landowner.
The Court of Appeal reversed. It held that R.S. 38:2356 was inapplicable to this case, stating "[m]erely because the legislature formally declared Atchafalaya Bay to be an arm of the sea does not mean that previously it was not." Davis Oil Company v. Citrus Land Company, 563 So.2d 401, 404 (La.App. 1st Cir.1990). The court went on to state: "absent a specific declaration from the legislature ... it is for the courts of this state to determine what is and is not an arm of the sea." Id. at 404. The Court then described its view of the proper analysis to use to determine who owns the alluvion: "[f]irst, on which bank or shore did the alluvion build up? Second, how is the bank or shore upon which the alluvion was deposited classified? As a river/stream or a sea/lake shore?" Id. at 403. The court then held the alluvion formed, as a matter of law, on the shore of Little Bay:
The alluvion at issue here is a peninsula, or delta, which extends seaward from the mouth of Shell Island Pass into Little Bay. At some point near the mouth of Shell Island Pass where the alluvion "connects" to the land before extending out into the bay, the bank of the river intersects with the shore of the bay.

*498 The shore of Little Bay, as seashore, is a public thing, insusceptible of private ownership, while the bank of the river is a private thing subject to public use. This being the case, where the riverbank intersects the seashore, the seashore, as a public thing insusceptible of private ownership, must prevail and the riverbank must yield to the seashore.
The riverbank ends at the high tide mark where the river meets the bay. The seashore extends all along the coast of Little Bay, between high and low tide. Therefore, the alluvion at issue here, insofar as it extends seaward from the mouth of Shell Island Pass into Little Bay, had to, as a matter of law, have built up on the shore of Little Bay.
Id. at 405.
For the reasons discussed more fully below, we affirm that part of the court of appeal ruling which holds R.S. 38:2356(M)(2) inapplicable in this case, and that part which holds Little Bay is an arm of the sea. However, we reverse the court of appeal's ruling that the alluvion must have, as a matter of law, formed entirely along the shore of Little Bay. We remand the case to the trial court for a new trial on the following issues: 1) where does the bank of Shell Island Pass end (i.e., the point at which the former shoreline of Little Bay intersects the bank of Shell Island Pass); and 2) where did the alluvion at issue accumulate; on the bank of Shell Island Pass, on the former shoreline of Little Bay, or on both? If the alluvion is found to have formed on the former shoreline of Little Bay, it is owned by the State. If, on the other hand, it is found to have formed on the bank of Shell Island Pass, it is owned by Citrus. If it is found to have formed on both the former shore of Little Bay and the bank of Shell Island Pass, the trial court must address whether La.C.C. art. 501, or the principle encompassed therein, should be applied to this case.[5]
The applicability of La.C.C. 501 is not properly before this court at this time.

I.
We first address the Court of Appeal's holding that R.S. 38:2356(M)(2) is not applicable to the issues presented in this case. The Court of Appeal rejected the trial court's finding that the statute implicitly establishes Little Bay was not an arm of the sea prior to its effective date. The Court found the legislative history of the statute indicated the legislature believed Atchafalaya Bay (of which Little Bay is a part) was already an arm of the sea when they recommended the adoption of the Act. We agree.
Louisiana Revised Statute 38:2356(M)(2) provides "[t]he area described in Section 2356(M)(1) is hereby permanently declared to be an arm of the sea and the laws of accretion and dereliction as defined in Civil Code Article 499 shall not apply; provided, however, as to other areas nothing herein shall be construed to affect the law of accretion and dereliction as defined in Civil Code Article 499." The trial court found, and Citrus argues in its brief to this Court, that the legislature did not consider the area at the mouth of Shell Island Pass to be an "arm of the sea" prior to July 12, 1974 because if they did, they would not have gone through the trouble of enacting R.S. 38:2356(M)(2). Citrus argues that the legislature, recognizing the rapid deltaic growth occurring in the area, wanted to prevent the State's further loss of land. Citrus goes on to argue that the legislature could not, however, have meant to divest private landowners of the ownership of land already formed as of July 12, 1974 because such a divestiture would constitute an unconstitutional expropriation of private property.
We find Citrus' arguments unconvincing. While we agree the statute clearly seeks to prevent the loss of lands forming in the Atchafalaya Bay region, we do not agree *499 it functions as a declaration that lands already formed in the area as of July 12, 1974 are privately owned. Quite to the contrary, we believe the legislative history of the statute indicates the legislature believed the Atchafalaya Bay region was an arm of the sea in 1974, and wanted to ensure that it would maintain such a status regardless of the extent of future deltaic development. The legislative history of Act 587 of 1974[6] shows the legislature was aware that the Atchafalaya Bay region was experiencing significant land gain, and that in 10 years it would be very difficult to distinguish between the various rivers and streams leading into Atchafalaya Bay and the Bay itself. Consequently, to foreclose the possibility the Atchafalaya Bay region may, at some point in the future, be found no longer to be an arm of the sea, the legislature declared it shall permanently be declared an arm of the sea. In short, R.S. 38:2356(M)(2) was designed to preserve Atchafalaya Bay's classification as an arm of the sea.[7] In any event, as the Court of Appeal aptly noted, "absent a specific declaration from the legislature, i.e., pre-1974, it is for the courts of this state to determine what is and is not an arm of the sea." If the legislature had intended to declare that alluvion formed in the Atchafalaya Bay region prior to July 12, 1974 was privately owned, they certainly could have said it more clearly than was done in R.S. 38:2356(M)(2).
Furthermore, assuming arguendo the Bay region was not an "arm of the sea" prior to July 12, 1974, the result reached by the trial court, and urged by Citrus, does not necessarily follow. As stated by this Court in State v. Placid Oil Company, 300 So.2d 154, 158 (La.1974), "[i]t is well-settled that, under [La.C.C. Articles 499, 500] accretions formed successively and imperceptibly on the shores of rivers or other streams, whether navigable or not, belong to the owners of the property to which they attach, but this is not the law in the case of lakes, bays, and arms of the sea." (Emphasis added). Thus, even if Little Bay was not an arm of the sea prior to July 12, 1974, it does not follow that alluvion formed along its shore belongs to the adjacent landowner. If Little Bay was a lake or a bay, alluvion formed along its shore belongs to the state.

II.
Having concluded R.S. 38:2356(M)(2) is not controlling in this case, we now turn to an examination of the law which is dispositive of the case. Civil Code articles 499 and 500 provide the bedrock upon which our analysis must rest. They provide:
Art. 499. Alluvion and dereliction.
Accretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion. The alluvion belongs to the owner of the bank, who is bound to leave public that portion of the bank which is required for the public to use. The same rule applies to dereliction formed by water receding imperceptibly from a bank of a river or stream. The owner of the land situated at the edge of the bank left dry owns the dereliction.
Art. 500. Shore of the sea or of a lake.
There is no right to alluvion or dereliction on the shore of the sea or of lakes.
"Seashore" is defined in La.C.C. art. 451 as "the space of land over which the waters of the sea spread in the highest tide during *500 the winter season." The bank of a navigable river or stream is defined as "the land lying between the ordinary low and the ordinary high stage of the winter." La. C.C. art. 456. Although this Court has never applied these articles in the context of deltaic accretion, it has had many opportunities to apply the articles in the context of rivers, streams, and lakes. See, State v. Placid Oil Company, 300 So.2d 154 (La. 1974); Amerada Petroleum Corp. v. State Mineral Board, 203 La. 473, 14 So.2d 61 (1943); Miami Corporation v. State, 186 La. 784, 173 So. 315 (1936); State v. Erwin, 173 La. 507, 138 So. 84 (1931). The opinions in these cases establish several wellsettled principles that are applicable in this case.
Alluvion which forms along the bank of a river or a stream belongs to the owner of the land adjacent to the bank. Alluvion which forms along the shore of a body of water that is not a river or a stream belongs to the State. State v. Placid Oil Company, supra. Thus, to determine the ownership of alluvion, a court must first determine the bank or shore upon which it has accumulated, and then it must classify the area upon which the alluvion accumulated as either the bank of a river/stream or the shore of a lake, bay, or arm of the sea. Contrary to the arguments raised by Citrus in its brief, how the alluvion itself is classified is irrelevant; the pertinent inquiry is where the alluvion accumulated. In this case, consequently, it simply does not matter whether or not the alluvion has become an extension of the right descending bank of Shell Island Pass.[8] As the Court of Appeal aptly stated, "[r]egardless of whether the alluvion at issue may be classified as the bank of a river or stream, or as seashore, it is first and foremost alluvion; and as such its ownership is determined by Civil Code articles 499 and 500." 563 So.2d at 405.
With these principles in mind, we now apply the legal precepts to the facts of this case. To classify the area upon which the accretion at issue accumulated, we must first classify Shell Island Pass and Little Bay. The Court of Appeal specifically held that Shell Island Pass is a river or stream for purposes of C.C. art. 499, and neither party challenges this ruling. Thus, the bank of Shell Island Pass constitutes "the bank of a river" for purposes of Civil Code article 499.
As to the classification of Little Bay, the pertinent inquiry is whether or not Little Bay is a river or stream; if it is anything other than a river or stream, alluvion formed along its shore is owned by the state. La.C.C. arts. 499, 500; State v. Placid Oil Company, supra. The Court of Appeal implicitly found Little Bay is not a river or stream when it held that "Little Bay, as part of Atchafalaya Bay, is directly open to the Gulf and is therefore either an arm of the sea or a part of the sea itself." 563 So.2d at 405. For the reasons explained below, we affirm this finding.
At the outset, we note Citrus does not now, and did not at trial, argue that Little Bay is a "river or stream" for purposes of Civil Code article 499. Throughout the proceedings, the parties implicitly agreed Little Bay was something other than a river or stream. This is evident in Citrus' heavy reliance on R.S. 38:2356(M)(2). Furthermore, Citrus' continued characterization of the alluvion as creating a "delta" tacitly acknowledges Little Bay is not a river or stream. A delta, by definition, forms at the mouth of a river, where the river intersects with a larger body of water that is not a river or stream. However, because the Court of Appeal rested its holding on a finding that Little Bay is either the sea or an arm thereof, and not on a finding that Citrus failed to prove Little Bay is a river or stream, we examined the record to see if it contains sufficient evidence to support a finding that Little Bay is an arm of the sea.
In Buras v. Salinovich, 154 La. 495, 97 So. 748 (1923), the court stated that the term "the sea" as used in La.C.C. art. 451 has "reference to the Gulf Coast, and to the lakes, bays and sounds along the Gulf *501 Coast." 97 So. at 750. Additionally, according to Louisiana jurisprudence the word "sea" applies to "arms of the sea," which are defined as bodies of water in the vicinity of the open Gulf and which are directly overflowed by the waters of the Gulf. Buras v. Salinovich, supra; Morgan v. Negodich, 40 La.Ann. 246, 3 So. 636 (1888). Although the main focus of the evidence at the trial in this case was on the development of the alluvial structure as of July 12, 1974, there is substantial evidence in the record which supports the Court of Appeal's conclusion. Several official maps of the region introduced into evidence clearly show that Little Bay, as a part of Atchafalaya Bay, is immediately adjacent to the Gulf of Mexico and constitutes "a bay along the Gulf Coast." There are no intermediate bodies of water in between the Gulf of Mexico and Atchafalaya Bay/Little Bay, and the mouth of Atchafalaya Bay opens directly into the Gulf. Furthermore, the testimony of Citrus' own expert witness, Mr. Cunningham, establishes that the alluvion, as well as the marshline to which the alluvion attaches, is washed by the tidal waters of the Gulf of Mexico. Thus, there can be no doubt the waters of Little Bay are directly overflowed by the waters of the Gulf of Mexico, and the Court of Appeal's finding that Little Bay is either part of the sea or an arm of the sea is supported by the record. Consequently, the shoreline of Little Bay constitutes "the shore of the sea" for purposes of Civil Code article 500.
Having classified Shell Island Pass and Little Bay, we turn to the critical question in this case: where, in relation to the former shoreline of Little Bay and the right descending bank of Shell Island Pass, did the alluvion at issue form.[9] The trial court did not rule on this point squarely. The Court of Appeal, on the other hand, treated the trial court's award of ownership to Citrus as an implicit finding that the alluvion formed along the bank of Shell Island Pass. The Court then overruled the implicit finding of the trial court and held the alluvion formed along the former shoreline of Little Bay as a matter of law. For the reasons that follow, we reverse this aspect of the Court of Appeal's ruling.
To support its conclusion the alluvion formed along the shoreline of Little Bay as a matter of law, the Court of Appeal reasoned that "where a riverbank intersects the seashore, the seashore, as a public thing insusceptible of private ownership, must prevail and the riverbank must yield to the seashore." 563 So.2d at 405. In so doing, the Court overlooked the precise issue which is at the heart of this case. That issue is, prior to the buildup of the alluvion at issue, at what point did the riverbank and the seashore intersect. As the numerous photographic exhibits demonstrate, the intersection of Little Bay and Shell Island Pass is not perfectly perpendicular. Rather, the area is rounded where the right descending bank of the Pass turns into the former shoreline of Little Bay. At some point along this "transition zone" the bank of Shell Island Pass ceased to be a riverbank and became what, at one time, was the shoreline of Little Bay. Not until this point is determined as precisely as scientifically possible can the ownership of the alluvion be determined.
Unfortunately, neither the trial court nor the Court of Appeal attempted to make a factual determination of the point of intersection. Because the parties at trial were preoccupied with R.S. 38:2356, most of the expert testimony was focused on establishing the extent of the alluvial buildup in July 1974 rather than on determining where the alluvion formed in relation to the boundary between the right descending bank of Shell Island Pass and the former shoreline of Little Bay. Even though several of the expert witnesses testified at various times that the alluvion was attached to the former shoreline of Little Bay, we do not feel comfortable relying on their testimony given the failure of either *502 attorney at trial to develop this aspect of the experts' testimony fully.[10] As a result, we simply cannot determine, with any degree of certainty, whether the alluvion formed entirely along the former shoreline of Little Bay or whether it formed partly on the right descending bank of Shell Island Pass. This being the case, justice is best served by giving both parties an opportunity to present scientific evidence specifically directed toward establishing where the alluvion at issue formed.
Thus, the case is remanded to the trial court for a new trial on the issue of whether the alluvion formed along the former shoreline of Little Bay, along the right descending bank of Shell Island Pass, or partly on the bank of Shell Island Pass and partly on the former shoreline of Little Bay. Of course, to answer this question, the trial court must make a factual determination of the location of the point where the right descending bank of Shell Island Pass intersects with the former shoreline of Little Bay. Additionally, if the trial court finds that the alluvion formed partly along the bank of Shell Island Pass and partly along the former shoreline of Little Bay, the court must determine whether La.C.C. art. 501,[11] or its underlying principle, should be applied. Because of the limited factual findings of the lower courts, whether or not La.C.C. art. 501 or its rationale applies is an issue not presently before this Court.[12]
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
DENNIS, J., joins in the opinion of the court and assigns additional reasons.

*503 APPENDIX A
This is an aerial photograph of the alluvion as it appeared on January 29, 1977. The tide stage at the time the picture was taken was -0.40 feet, low tide.

*504 DENNIS, Justice, concurring.
I agree with the majority's conclusion that the matter must be remanded to the trial court for a determination of whether the alluvion formed on Shell Island Pass, on the shoreline of Little Bay (as it existed before any alluvion formed) or both.
However, I would add that, if the trial court determines that the alluvion formed on both Shell Island Pass and Little Bay, the court should apply La.Civ.Code art. 501 by analogy to determine the most appropriate division of the alluvion. In other words, the court should use the principles enunciated by the article to divide the alluvion between the State (the seaward from the shoreline owner) and Citrus Oil Company (the riverbank owner). Moreover, the court should note that La.Civ.Code art. 501 does not provide a simple mechanical rule. Historically, the article refers to several different approaches or applications. See Note, Property-Apportionment of Alluvion Between Riparian Owners-Article 516, Louisiana Civil Code of 1870, 34 Tul.L.Rev. 638 (1960). In the present case, the trial court should use sound discretion in applying article 501 by analogy and in choosing the most appropriate application or combination of applications in dividing the ownership of the alluvion between the parties.
NOTES
[1] See Appendix A following this opinion for a photograph of the area in dispute.
[2] Normally, deltaic development extends both the left descending bank and the right descending bank of a river into the body of water adjoining the mouth of the river. However, the evidence at trial established that the extension of the left descending bank of Shell Island Pass into Little Bay was almost non-existent due to the strong cut-back currents emanating from the mouth of the Atchafalaya River, which is due east of the mouth of Shell Island Pass.
[3] Apparently, the trial court felt that any accretion which had formed prior to the effective date of the statute would have formed in an area that was not an "arm of the sea." Also, the trial court apparently felt that if the accretion formed in an area that was not an "arm of the sea" it could not constitute seashore alluvion and, therefore, must be riverbank alluvion. For the reasons explained in part II of this opinion, we believe the trial court's reasoning was flawed.
[4] The area described in R.S. 38:2356(M)(1) comprises everything seaward of a line drawn along the mean high water mark of the Atchafalaya Bay, "closing off all bayous and navigable channels."
[5] Civil Code article 501 provides: "[a]lluvion formed in front of property of several owners is divided equitably, taking into account the extent of the front of each property prior to the formation of the alluvion in issue. Each owner is entitled to a fair proportion of the area of the alluvion and a fair proportion of the new frontage on the river, depending on the relative values of the frontage and the acreage."
[6] La.R.S. 38:2356(M)(2) was enacted by Act 587 of 1974.
[7] Our interpretation of R.S. 38:2356(M)(2) is fully supported by the available legislative history of Act 587 of 1974. The minutes of the hearing of the Senate Natural Resource Committee, the committee in which the act was debated, are illuminating. At the hearing, Senator Duval asked Mr. Eldred, Special Counsel to the Attorney General, if it was his intent, in introducing the bill, to change the law with respect to accretion in the bay areas. Mr. Eldred replied that "the purpose of the legislation is to keep what the State owns today." (Emphasis added). He went on to say that "the purpose is not to change the law but to preserve the bay areas in the perspective in which they are today." Mr. Fred Ellis, who was then a Professor of Law at L.S.U. Law School and a Special Assistant to the Attorney General, explained that the act "would make it clearer that the area in question is not subject to Article 509, [the precursor article to La.C.C. art. 499]."
[8] At trial, Citrus spent a great amount of time trying to establish the alluvion is an extension of the right descending bank of Shell Island Pass.
[9] As used throughout this opinion, the term "former shoreline of Little Bay" refers to the shoreline of Little Bay as it existed before any of the disputed alluvion formed. The numerous photographic exhibits introduced into evidence clearly indicate that the former shoreline of Little Bay is easily distinguishable from the alluvion at issue.
[10] The testimony of Rodney Adams, a coastal geologist called by Citrus, provides a good example of how the evidence in this case has not been developed to the degree necessary for this Court to make a ruling on the issue of where the alluvion formed. At one point in the trial, Rodney Adams testified that the alluvion formed outward from the former shoreline of Little Bay and attached to the former shoreline. He stated that layers of accretion built up on the sloping shoreline of Little Bay. This testimony implies the alluvion formed entirely along the former shoreline of Little Bay. However, at another point in the trial, Mr. Adams' testimony suggests the alluvion initially began forming along the bank of Shell Island Pass, near its mouth, and slowly grew outward, eventually attaching to the former shoreline of Little Bay. This latter testimony suggests the alluvion is actually one continuous structure which attaches, at least in part, to the bank of Shell Island Pass. Had counsel for the parties been aware of the importance of determining where the alluvion formed, Mr. Adams' testimony concerning the formation of the alluvion surely would have been clarified. However, because of their preoccupation with R.S. 38:2356, the parties were unaware of the importance of establishing where the alluvion formed, and the conflicts in Mr. Adams' testimony were not addressed. Similar ambiguities are contained in the testimony of Rob Cunningham, an expert geographer called by Citrus.
[11] See, supra note 5.
[12] In its brief to this court, Citrus argues that if it is determined the alluvion formed partly on the shore of Little Bay and partly on the bank of Shell Island Pass, then the trial court should apply La.C.C. art. 501.